Roland **WEBB, Plaintiff and Appellant,**

**v.**

**R.O.A. GENERAL, INC., a Utah corporation; William Reagan, individually; William Adams, individually; and Douglas T. Hall, individually, Defendants and Respondents.**

No. 880197–CA.

Court of Appeals of Utah.

April 11, 1989.

Carol Goodman, Val J. Christensen, Alan E. Barber, Ross C. Anderson, Salt Lake City, for plaintiff and appellant.

Philip R. Fishler, Dennis M. Astill, Salt Lake City, for defendant and respondent William Reagan.

Douglas T. Hall, Salt Lake City, for defendant and respondent R.O.A. General, Inc.

Before Billings, Jackson and Orme, JJ.

## OPINION

JACKSON, Judge:

Roland Webb filed this action against R.O.A. General, Inc. ("R.O.A."), a Utah corporation, and William Reagan, its majority shareholder, and others, in part to enforce his claimed right to examine R.O.A.'s corporate books and records pursuant to Utah Code Ann. § 16–10–47(b) (1987), a section of the Utah Business Corporation Act (the "Act"). He also sought the imposition of penalties under Utah Code Ann. § 16–10–47(c) (1987) for respondents' refusals to permit such an examination. The trial court, on cross-motions for partial summary judgment on these claims, ruled Webb had no inspection rights because he had ceased being a shareholder of record within the meaning of the statute. We reverse.

Webb and Reagan formed R.O.A. by written agreement dated July 7, 1981. Reagan received eighty percent of the stock and Webb the remaining twenty percent. Reagan remains the controlling shareholder and corporate president. The incorporation agreement gives R.O.A. an option to purchase Webb's shares, but the option provisions do not fix a purchase price. Instead, after the option is exercised, the parties are to engage in an alter-

nating appraisal process to arrive at a price, beginning with an appraiser selected by the seller. The final pricing step is that "any appraisal agreed to by two of the three appraisers shall be binding on the parties hereto absent fraud." No time frame or deadline is specified for the appraisal process. When this process yields a purchase price, the agreement provides alternative payment terms: (1) in cash; (2) 120 equal monthly payments with interest; or (3) such other terms as may be agreed to by the parties. The agreement contains no provision or time frame for delivery of the stock.

Reagan served Webb with a notice of R.O.A.'s exercise of its option dated January 27, 1987. The notice did not identify any price, select any terms of payment, or propose any time frame for the stock conveyance. Reagan's notice invited Webb to meet with him at Webb's earliest convenience "to discuss information which I have concerning the value of the R.O.A. General, Inc. stock" and other aspects of the transaction.

According to the facts set forth by Webb in affidavits filed in support of his motion for partial summary judgment, Webb pledged his stock in March 1987, at R.O.A.'s request, to secure a bank loan to R.O.A. On April 20, 1987, Webb submitted to R.O.A. a written request to examine the corporate books and records pursuant to section 16–10–47 in order to protect his interests as a shareholder and determine R.O.A.'s actual financial condition. R.O.A.'s vice president of administration and finance responded in a letter dated May 5, 1987, suggesting that Webb (1) postpone the inspection a few weeks because of the departure of a key employee in the accounting department, (2) specify which records were to be examined, and (3) wait a few weeks until Reagan returned to town. Webb, through one of his accountants, then sent an itemized list of the specific records and documents he wanted to examine.

On May 20, 1987, Webb's counsel sent a letter notifying R.O.A. of the appraiser selected and of Webb's intent to proceed with the inspection of the corporate records on May 27, 1987, a normal business day, beginning at 10:00 a.m. On May 26, R.O.A.'s counsel, William Adams, delivered to the offices of Webb's counsel a letter stating that the books would be made available for inspection when the selected appraiser, not other accountants, wanted to examine them. Webb's counsel and accountants proceeded to R.O.A.'s corporate offices on May 27, as planned, but were refused access to the books and records by Adams, after consultation with Reagan.

On May 29, Webb commenced this lawsuit. On June 3, 1987, his counsel submitted to R.O.A. another written notice of Webb's intent to have his accountants inspect the corporate records, this time on June 5, 1987. Webb's counsel was informed by Adams on June 4 that the inspection would not be allowed by R.O.A. because it would disrupt business and there was no staff person available to find the company's files. This refusal was confirmed in a letter from Adams that afternoon stating that R.O.A. staff would be available one-half day each day for the week commencing June 15, 1987.

Webb's counsel and accountants appeared at R.O.A. offices at 9:00 a.m. on June 15, but were again refused access to the books and records by Reagan and Hall, another R.O.A. attorney, who asserted for the first time that Webb had no inspection right because of R.O.A.'s January 1987 notice of its exercise of the stock purchase option.

Webb then amended his complaint to add allegations about the two June refusals. In his second cause of action, he requested recovery of a statutory penalty under section 16–10–47(c) against R.O.A., and against Reagan and Adams separately for each of the three refusals of inspection. He also sought injunctive relief to enforce his inspection rights under section 16–10–47(b). His ensuing motion for partial summary judgment on this cause of action was filed only against R.O.A. and Reagan, although he specifically reserved the right to proceed subsequently against Adams and Hall.

In their cross-motion for partial summary judgment, R.O.A. and Reagan argued Webb's statutory right to examine the corporate books terminated as a matter of law when R.O.A. gave notice of exercise of its option to purchase his stock, even though he was still shown on the corporate books as a holder of twenty percent of the stock and had neither endorsed, delivered, or received payment for his shares. They also filed the affidavits of Reagan and R.O.A.'s vice president in opposition to Webb's motion, purporting to create material issues of fact about the reasonableness of their refusal of his inspection requests, even if he retained his inspection rights under the statute. The affiants, however, did not deny the facts asserted in Webb's supporting affidavits, including the fact that Webb had been refused access to the books and records on May 27, June 4, and June 15. They merely claimed that Webb had been provided monthly financial statements and access to the corporate records prior to July 1986 and asserted that his requests were not reasonable, citing several excuses for the refusals, such as lack of key personnel and disruption of the business. They also argued that Webb's requests were vexatious and went beyond the information he really needed. In his affidavit, Reagan accused Webb of making the requests in bad faith to harass the corporation. No facts were asserted to support these conclusory claims or to dispute the purpose asserted by Webb, i.e., to protect his interests as minority shareholder and determine the true financial condition of the corporation. Affiant Reagan did dispute Webb's assertion that his stock was worth more than $50,000, contending that, even if there was a refusal of Webb's lawful inspection demand, the statutory penalty could not be calculated until the value of Webb's shares was determined according to the terms of their agreement.

The trial court agreed with the respondents and held that Webb's inspection right and his status as a shareholder of record under section 16–10–47(b) terminated when R.O.A. exercised its purchase option. That ruling presents a narrow legal issue of first impression in Utah.

Section 16–10–47(b) provides:

Any person who is a shareholder [1] of record, upon written demand stating the purpose thereof, shall have the right to examine, in person, or by agent or attorney, at any reasonable time or times, for any proper purpose, its books and records of account, minutes and record of shareholders and to make extracts therefrom. A proper purpose means a purpose reasonably related to the person's interest as a shareholder.

On appeal, we review the trial court's conclusions of law for correctness, with no particular deference to the trial court. *Creer v. Valley Bank & Trust,* 770 P.2d 113 (Utah 1988); *Western Kane County Special Serv. Dist. No. 1 v. Jackson Cattle Co.,* 744 P.2d 1376, 1378 (Utah 1987). That same lack of deference applies to the trial court's interpretation of an unambiguous, integrated contract, *Zions First Nat'l Bank v. National Am. Title Ins. Co.,* 749 P.2d 651, 653 (Utah 1988), and to its interpretation of statutes, *Bonham v. Morgan,* 102 Utah Adv.Rep. 8, 9 (1989); *Asay v. Watkins,* 751 P.2d 1135 (Utah 1988), both of which present questions of law.

■ The issue central to this appeal is the nature of the contract the parties intended to create at the time of the exercise of R.O.A.'s purchase option. *See Taylor v. Daynes,* 118 Utah 61, 218 P.2d 1069, 1072 (1950); *Jones v. Commercial Inv. Trust,* 64 Utah 151, 228 P. 896, 900 (1924). That intent must be determined as a matter of law from the nature and text of the entire written agreement itself, if possible. *Buehner Block Co. v. UWC Assocs.,* 752 P.2d 892, 895 (Utah 1988); *accord* 12A *Fletcher Cyc. Corp.* § 5613 (1984). In other words, did the parties intend title to Webb's stock to be transferred to R.O.A. upon exercise of the option, leaving executory only their respective purchase and

---

**1.** The Act defines a shareholder as "one who is a holder of record of shares in a corporation." Utah Code Ann. § 16–10–2(15) (1987) (redesignated as Utah Code Ann. § 16–10–2(11) (1988)).

sale obligations under the contract?[2] Or did they intend that exercise of the option would create a wholly executory contract to sell the shares, with title to remain in Webb until transferred to R.O.A. at some subsequent time?

Here, the agreement of the parties did not specify the time for transfer of legal title to Webb's shares or their actual delivery. But it did leave open for determination, after exercise of R.O.A.'s purchase option, both the purchase price and the final terms of payment, without specifying the time frame for the completion of those determinations. Thus, the parties recognized there must be further agreement on each of these terms after R.O.A.'s notice. These terms and the parties' use of the potentially lengthy appraisal process to set the price of Webb's stock compel the conclusion that they did *not* intend that Webb would immediately divest himself of legal ownership of the shares at the moment the option was exercised, but that he would retain legal title until some later time when these essential terms of the sale were completed. It is thus clear from the agreement itself that the parties intended legal ownership to transfer to R.O.A. at some point after notice was given, concurrent with a subsequent event, such as full payment or commencement of installment payments.[3]

This interpretation of the parties' agreement is buttressed by the uncontroverted facts that Webb pledged his stock at R.O.A.'s request even after R.O.A.'s notice of exercise of its option and, at least until June 15, R.O.A. and Reagan treated Webb as the legal owner of the shares. It is also consistent with the conclusions of other courts in cases involving similar agreements and similar inspection rights.

For example, in *Estate of Bishop v. Antilles Enters., Inc.*, 252 F.2d 498 (3d Cir. 1958), the shareholders of the respondent corporation entered into a cross-purchase agreement providing that, upon the death of shareholder Bishop, the surviving shareholders had the option to purchase his shares from his estate at book value. Following Bishop's death, Vose, one of the surviving shareholders, asserted his right to purchase Bishop's stock from his estate. Vose claimed the stock was worthless and tendered $1.00 in payment. The district court held that the estate was entitled, as a holder of legal title, to exercise its common law right to examine the corporation's books and records. On appeal, the respondent corporation contended that "by virtue of the agreement between the stockholders, title to and ownership of Bishop's stock had passed to Vose immediately upon the election of the latter to purchase it." *Id.* at 499.

The Third Circuit Court of Appeals rejected the corporation's argument and held that, even assuming Vose's election of the option to purchase the stock vested his right to transfer of the stock upon payment of the purchase price, it did not divest the estate administrator of legal title to the shares or of the rights of a stockholder.

---

**2.** The issue presented in *Taylor v. Daynes,* 118 Utah 61, 218 P.2d 1069 (1950), was whether oral negotiations about the sale of stock, coupled with the parties' conduct and a written memorandum, constituted an executory contract to purchase the stock or a present purchase and sale accompanied by an immediate transfer of interest when the stock certificates were handed over to the purchaser. The trial court's finding that the parties intended a contract of immediate sale and purchase was upheld by the Utah Supreme Court as supported by the evidence at trial. *Taylor,* 218 P.2d at 1072. In an earlier case involving the interpretation of a written agreement by an employer to repurchase stock sold to an employee if the employee was discharged, the court determined that the parties had intended title to the stocks to transfer to the employer immediately upon the occurrence of the condition subsequent, i.e., the employee's discharge. *Davies v. Semloh Hotel,* 86 Utah 318, 44 P.2d 689 (1935).

**3.** In the context of a preliminary agreement for the sale of an apartment building, the Utah Supreme Court has stated:

There is implied in an agreement for the sale of real estate, unless a contrary intention is expressed, that the vendor shall retain title until the balance of the purchase price is paid. Where there is an agreement on the part of one to convey and on the part of another to pay a definite sum, payment and conveyance are concurrent acts, unless a contrary intention appears.

*Johnson v. Jones,* 109 Utah 92, 164 P.2d 893, 895 (1946).

*Id.* Moreover, the court concluded, assuming the agreement to sell the stock was valid and binding,

> the [administrator's] right ... to have access to the books and records of the corporation certainly will continue at least until after the proper amount of the purchase price has been authoritatively determined and has been paid. Until then it is obvious that the petitioner has a very real interest in securing accurate information as to the state of the respondent corporation's accounts....

*Id.*

Similarly, in *Knaebel v. Heiner*, 673 P.2d 885 (Alaska 1983), a shareholder, Knaebel, had executed a valid contract that called for the exchange of his shares (for stock in another corporation) prior to the date of his demand for inspection. Heiner, custodian of the corporation's records, refused Knaebel's written demand for inspection of the books and records under a statute extending that right to a "shareholder of record for at least six months" or a "holder of record of at least five percent of all the outstanding shares of a corporation." *Id.* at 885 & n. 1. Heiner argued that, if there was a valid contract calling for the exchange of Knaebel's stock on a certain date prior to his demand for inspection, he could have no right of inspection after that date. *Id.* at 886.

On appeal, the Alaska Supreme Court rejected this argument and held that the contract was executory until the exchange of the shares actually took place. Thus, the agreement by itself did not cancel Knaebel's status as a shareholder of record for purposes of the inspection statute, "any more than a land sale contract which specifies a date for closing cancels a recorded deed on the specified date." *Id.* at 887. *See also Shelters, Inc. v. Mankin*, 130 Ga. App. 859, 204 S.E.2d 810 (1974) (executory contract to sell stock to third party did not deprive shareholder of statutory right of inspection); *Hoover v. Fox Rig & Lumber Co.*, 199 Okl. 672, 189 P.2d 929 (1948) (despite corporation's exercise of option to purchase stock, shareholder retained title as legal owner together with statutory right of inspection).

We conclude that the contract formed when the notice of exercise of option was given to Webb constituted a contract to sell the shares, with legal title remaining in Webb after that point in time. Accordingly, R.O.A.'s notice of exercise of its option pursuant to the parties' agreement did not terminate Webb's status as a shareholder of record for purposes of section 16–10–47(b). The trial court erred in ruling otherwise.

■ We next address briefly R.O.A.'s claim that Webb waived or contracted away his statutory right of inspection because the parties' agreement provided for an appraisal procedure to be followed after the option notice was served. Waiver is an intentional relinquishment of a known right. *Hunter v. Hunter*, 669 P.2d 430, 431 (Utah 1983). "It must be distinctly made, although it may be express or implied." *Id.* (quoting *American Savings & Loan Ass'n v. Blomquist*, 21 Utah 2d 289, 292, 445 P.2d 1, 3 (1968)). Assuming the statutory right could be contracted away consistent with public policy, R.O.A. has not identified any contract provision which either expressly or impliedly waives or modifies Webb's statutory inspection right. Indeed, Section 16 of their agreement, captioned "Rights of Ownership," states, "The Stockholders shall retain all their rights as stockholders of the Corporation, except those specifically modified by this Agreement." We conclude there was no waiver or contractual surrender of Webb's rights as a shareholder under section 16–10–47.

We turn now to the issue of statutory penalties against R.O.A. and Reagan. Utah Code Ann. § 16–10–47(c) (1987) provides:

> Any officer or agent who, or a corporation which, shall refuse to allow any such shareholder, or his agent or attorney, so to examine and make extracts from its books and records of account, minutes, and record of shareholders, for any proper purpose, shall be liable to such shareholder in a penalty of 10% of the value of the shares owned by such shareholder, in addition to any other damages or remedy afforded him by law; but no such penal-

ty shall exceed $5,000. It shall be a defense to any action for penalties under this section that the person suing therefor has within two years sold or offered for sale any list of shareholders of such corporation or any other corporation or has aided or abetted any person in procuring any list of shareholders for any such purpose, or has improperly used any information secured through any prior examination of the books and records of account, or minutes, or record of shareholders of such corporation or any other corporation, or was not acting in good faith or for a proper purpose in making his demand.

As a shareholder of record, Webb had a right to examine the corporate books pursuant to section 16–10–47(b) at a reasonable time upon written demand.[4] The statute limits the shareholder's inspection right only insofar as the requested examination must be for a "proper purpose," defined in that subsection as one "reasonably related to the person's interest as a shareholder."

■ There is no question that Webb made the necessary written demands for inspection of R.O.A.'s books and records at reasonable times, i.e., during normal business hours. *See Clawson v. Clayton*, 33 Utah 266, 272, 93 P. 729, 731 (1908). Based on the undisputed facts in the record, we find that, as a matter of law, Webb's inspection requests were for a proper purpose within the meaning of the act, namely, to determine the corporation's true financial condition and thereby protect his interests as a minority shareholder in the process of selling his shares.

In their response to Webb's motion for partial summary judgment, R.O.A. and Reagan did not dispute the stated facts concerning the direct refusals of Webb's demands for inspection on three occasions. Instead, their supporting affidavits merely offered excuses which, even if true, would not establish any of the defenses to an action for penalties enumerated in section 16–10–47(c), and made conclusory allegations of bad faith without asserting any supportive facts.[5] *See Brigham Truck & Implement Co. v. Fridal*, 746 P.2d 1171, 1173 (Utah 1987); *Williams v. Melby*, 699 P.2d 723, 725 (Utah 1985).

R.O.A.'s and Reagan's repeated stall tactics, first leading Webb to believe inspection would be granted, then refusing access to the books at the agreed-upon time for specious, fluid reasons, represent exactly the type of conduct by a corporation or its officers or agents that the statute is designed to curtail through the imposition of penalties. Without sanctions to discourage the refusal of proper inspection requests, the corporation or its officers "could, by refusing access, delay inspection until the right was actually litigated." 2 *Model Business Corporation Act* § 52 commentary at 129 (2d ed. 1971).

■ Section 16–10–47(c) clearly authorizes the imposition of a penalty for each refusal to allow inspection. Unlike the shareholders in *Meyer v. Ford Industries, Inc.*, 272 Or. 531, 538 P.2d 353 (1975), who sought the imposition of eight statutory penalties because that was the number of items they had asked to inspect, Webb made three separate and independent requests, which were separately refused. We agree with Webb that, if the statute is to have any deterrent effect, violating parties should not be permitted to purchase multiple and serial exemptions from the law's mandate for a one-time penalty fee, regardless of how often they refuse distinct, lawful shareholder demands for inspection of the corporate records.[6]

■ Based on the undisputed facts in the record, Reagan, as an individual, and R.O.A., as an entity, each participated in the May 27 and June 15 refusals; R.O.A.,

---

4. Any corporate agent or officer with custody or control of corporate books who refuses a bona fide shareholder's lawful demand for their inspection or copying is also guilty of a class B misdemeanor. Utah Code Ann. § 76–10–708 (1978).

5. In a second affidavit filed with the trial court, Reagan sought to justify the refusals on the basis that the records Webb sought to examine were confidential. This fact alone, however, is insufficient to deny the statutory inspection right. *See Fears v. Cattlemen's Inv. Co.*, 483 P.2d 724, 730 (Okla.1971).

6. By the same token, penalties should not be artificially compounded by identical, repetitious requests that prompt multiple, predictable refus-

as an entity, was a participant in the June 4 refusal, while Reagan, as an individual, was not. *See generally* 5A *Fletcher Cyc. Corp.* § 2256 (1987). Webb is, therefore, entitled to partial summary judgment against each responsible respondent in the amount of the mandatory statutory penalty for each of the three separate refusals to allow him to exercise his inspection rights as a shareholder.

Because the statute sets the amount of each penalty at ten percent of the value of the shareholder's shares plus other damages, not to exceed $5,000, and the parties' agreement dictates that the value of Webb's shares is to be determined through the appraisal process, the amount of each penalty must be fixed by the trial court on remand after the valuation is complete and Webb has been afforded an opportunity to present evidence concerning any other damages to which he is entitled.

The partial summary judgment entered in favor of respondents is reversed. The case is remanded for entry of partial summary judgment against Reagan and R.O.A., in accordance with this opinion, and for further proceedings to determine the amount of the statutory penalty to be imposed on them for each of the three separate wrongful refusals to permit inspection of the corporate books and records. In addition, the district court is directed to grant forthwith Webb's request for injunctive relief enforcing his statutory inspection right.

BILLINGS and ORME, JJ., concur.

als. Form is not to be elevated over substance in determining the number of independent requests made by a shareholder of record, each of which qualifies for a separate penalty if refused. There might be cases in which multiple "requests" would be more properly regarded as a single request repeatedly renewed. However, this is not such a case. It is clear that three separate requests were made by Webb and refused, as evidenced by the passage of time between requests and the inconsistent variety of responses. Webb's first request to examine the books and records on May 27 was denied for the express reason that only Webb's appraiser, not his accountants, was a proper agent. His June 3 inspection request, on the other hand, was denied because it would be disruptive and no staff was available to find the necessary files, which had been identified by Webb in early May. Instead, Webb was informed, the inspection would proceed on June 15, with R.O.A. staff available at that time. When Webb's agents appeared on June 15, as instructed, access to the corporate records was again refused, this time because of Webb's alleged lack of "shareholder of record" status.