INTERWEST CONSTRUCTION, a Utah corporation, Plaintiff and Appellee,

v.

R. Roy PALMER and Val W. Palmer, dba A.H. Palmer & Sons, Defendants and Appellees.

R. Roy PALMER and Val W. Palmer, dba A.H. Palmer & Sons, Third–Party Plaintiffs,

v.

John RYSGAARD, dba Fiberglass Structures Company, and Fiberglass Structures Company, Inc., Third–Party Defendants.

FIBERGLASS STRUCTURES AND TANK COMPANY, fka Fiberglass Structures Company of St. Paul, Inc., Third–Party Plaintiffs,

v.

THIOKOL CORPORATION, Third–Party Defendant and Appellant.

No. 930219–CA.

Court of Appeals of Utah.

Nov. 30, 1994.

Certiorari Granted March 21, 1995.

Mary Anne Q. Wood, Richard G. Wilkins, and Anthony B. Quinn, Salt Lake City, for defendant and appellant Thiokol.

George W. Preston, Logan, and Robert W. Wallace, Salt Lake City, for plaintiff and appellee A.H. Palmer & Sons.

Steven D. Crawley, Salt Lake City, for plaintiff and appellee Interwest Const.

Before BENCH, DAVIS and ORME, JJ.

## OPINION

ORME, Associate Presiding Judge:

This appeal arises from a rather complicated, multi-party construction dispute. Thiokol Corporation appeals the judgment in favor of appellees Interwest Construction and A.H. Palmer & Sons.[1] We affirm.

## FACTS

All parties acknowledge that the trial court's factual findings withstand challenge under the clearly erroneous standard. *See Jacobs v. Hafen,* 875 P.2d 559, 561 (Utah App.1994). We recite the facts accordingly.

---

1. We resolve a separate appeal growing out of the same action by unpublished memorandum decision.

In the fall of 1988, Interwest agreed to construct a waste treatment facility for Thiokol. On December 1, 1988, Interwest subcontracted with Palmer to provide materials and perform the labor necessary for the construction of part of the treatment facility. Pursuant to the subcontract agreement, Palmer was to provide, among other things, three fiberglass waste-water storage tanks designated as T32, T33, and T34. On February 28, 1989, Palmer entered into a purchase order agreement with Fiberglass Structures, Inc., under which Fiberglass Structures agreed to manufacture and install the storage tanks.

Upon completion of the tanks on April 30, 1989, Thiokol tested the three storage tanks. During the trial test, tank T34 ruptured. Following the failure of T34, Thiokol negotiated directly with Fiberglass Structures to determine the cause of the failure, replace the ruptured tank, and repair the remaining tanks in accordance with Thiokol's original specifications. In an angry exchange of letters and professional opinions, Thiokol's project engineer vehemently disagreed with Fiberglass Structures' assessment of the tanks' deficiencies and the proposed solution.[2]

On May 1, 1989, Thiokol inspected the waste treatment plant and notified Interwest that it considered the facility to be substantially complete, notwithstanding the rupture of T34 the previous day and the repairs to the tanks that would necessarily be required. Under Thiokol's supervision, Fiberglass Structures replaced the failed tank and reinforced the existing tanks according to the design specifications suggested by Fiberglass Structures and approved by Thiokol. Thiokol tested and accepted the three tanks based on its determination that the tanks were built according to these plans and specifications. Interwest and Palmer were not directly involved in these negotiations or the ensuing remedial actions.

Thiokol began operating the waste treatment facility during the summer of 1989. Sometime after June 2, 1989, Thiokol modified the three tanks, changing the method of filling the tanks from the gravity feed system specified in Thiokol's own plans and specifications to an overhead feed. On August 24, 1989, a Thiokol employee overfilled T33, resulting in the tank holding some 3,000 gallons in excess of its proper capacity. Had Thiokol not altered the method by which the tanks were filled, it would not have been possible to overfill the tanks. In the early morning hours of August 24, tank T33 ruptured, spilling its liquid-waste contents. At the time the tank failed, Thiokol owed Interwest $200,000 under the contract. Of this amount, Interwest owed Palmer $93,673.70. Thiokol withheld the balance due Interwest as compensation for the damages Thiokol alleged it suffered as a result of the tank's failure, and Interwest, in turn, withheld payment from Palmer.

### PROCEEDINGS BELOW

The posture of this case is unusual in that Interwest did not sue Thiokol for the amount due under the contract, nor did Thiokol sue Interwest for breach of warranty, negligence, or breach of contract. Instead, Interwest commenced this action by filing a complaint against Palmer for breach of contract, indemnity, negligence, and breach of warranty. Interwest also sought indemnification from Palmer for attorney fees, costs, and expenses incurred as a result of the tank failure.[3] Interwest later filed an amended complaint adding Thiokol as a defendant, and in addition to restating its claim against Palmer, sought recovery from Thiokol under theories of breach of contract and unjust enrichment. Palmer filed a third-party complaint against Fiberglass Structures, which, in turn, filed a third-party complaint against Thiokol. Thiokol responded by bringing counterclaims and third-party complaints against Fiber-

**2.** On the advice of its engineer, Thiokol conditioned its accepting Fiberglass Structures' repair of tanks T32 and T33 and replacement of T34 on securing an extended warranty directly from Fiberglass Structures. On June 13, 1989, Fiberglass Structures provided Thiokol with the extended three-year warranty it desired.

**3.** The parties stipulated below that the resolution of attorney fees would be decided in a separate hearing. That proceeding is the subject of the appeal referred to in note 1.

glass Structures and Palmer and a counter-claim against Interwest.

Before the trial court, Thiokol claimed Interwest, Palmer, and Fiberglass Structures breached their contracts because the tanks were not manufactured in accordance with contract specifications, did not meet industry standards, and were defective in design and manufacture. Thiokol also claimed that Interwest, Palmer, and Fiberglass Structures (1) breached numerous express warranties, as well as the implied warranties of fitness and merchantability, (2) negligently breached their duty of care, and (3) were strictly liable for designing, manufacturing, and supplying the defective tanks and creating a dangerous condition.

At trial, the cause of the tank's failure was vehemently disputed. The trial court received documents and exhibits and heard substantial testimony concerning the issue of causation. After carefully evaluating the evidence,[4] the court made the following findings:

> Notwithstanding evidence to the contrary the Court finds that the tanks were built pursuant to Thiokol's design specifications. There is little question, however, that the tanks were under-designed, that they did not have sufficient hoop or tensile strength and likely may have eventually failed in any regard.
>
> . . . .
>
> . . . Thiokol knew of the wall thickness or lack thereof and of the safety concerns and accepted tanks T32, T33 and T34 with said deficiencies. Whatever deficiencies there may have been were fully accepted by Thiokol.
>
> . . . .
>
> The installation of pumps and an overhead method of filling the tanks allowed Thiokol to fill the tanks beyond their capacity. The Court finds that this was the most likely cause of the failure. The Court further finds that an overfilling of the tank

would not have occurred had the gravity feed system remained in place. . . .

> The Court finds that the overfilling was most likely the cause of the failure which created an uplifting force on the tank which the tank was not designed to withstand.

Having found that the tanks were built according to Thiokol's own specifications, that Thiokol accepted the tanks knowing they were structurally deficient, and that tank T33 failed because Thiokol unilaterally modified the tank, thereby making it possible for one of its own employees to overfill the tank and subject it to pressure which it was not designed to withstand, the trial court ruled against Thiokol and awarded Interwest the $200,000 it was due under the contract. Likewise, Interwest was ordered to pay Palmer the $93,673.70 owed for the work it performed. In accordance with this judgment, the court dismissed Thiokol's claims with prejudice. Thiokol appeals.

## BREACH OF CONTRACT

█ Thiokol does not challenge the trial court's factual findings. Instead, Thiokol contends that the court misapplied the law pertaining to contractual disputes and erroneously concluded that Thiokol's negligence, which caused the tank to fail, absolved appellees of all liability for breach of contract. Since Thiokol challenges the trial court's interpretation of the contract and ensuing legal determinations as matters of law, we review the court's decision for correctness. *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985); *Crowther v. Carter,* 767 P.2d 129, 131 (Utah App.1989).

At the heart of Thiokol's argument on appeal is its claim that the trial court erred by applying comparative fault principles, typically germane to resolving disputes grounded in tort, to what the trial court recognized as being solely a contractual dispute. Thiokol points to language from the trial court's

4. The case was tried to the court over a two-week period. With commendable care, the trial court detailed its findings of fact by memorandum decision. Having held hearings to provide counsel on both sides the opportunity to object to the preliminary findings, the trial court twice amended its findings, resulting in the detailed findings now before us. Thiokol does not accept all the findings as true, but concedes they are supported by sufficient evidence to withstand challenge on appeal.

decision to support its contention. Specifically, the trial court found that "[t]here is little question" that "the tanks were under-designed" and "did not have sufficient hoop or tensile strength." Thiokol contends that despite the court's determination that the tanks were under-designed and its subsequent assertion that "the case is entirely controlled by contract," it ruled that appellees were not in breach of the contract because Thiokol "should have been aware" of the tanks' deficiencies. Thiokol concludes by pointing out that Thiokol's contributory negligence is not a defense against appellees' breach of contract.[5]

■ However, Thiokol's selective focus on the tort-based principles referred to by the trial court ignores the finding that is dispositive of the breach of contract question. The court definitively found that the tanks were built pursuant to the design specifications mandated by Thiokol in the contract. The court also found, however, that the tanks' design was inadequate for their intended use. In an attempt to explain the apparent contradiction between these two findings, the court went on to explain that Thiokol was the party at fault for both the tanks' design deficiencies and the ultimate failure of tank T33. Nevertheless, the trial court's elaboration in no way negates its pivotal factual finding that appellees built and supplied the tanks in accordance with the terms of the contract.

■ Thiokol further argues that appellees breached their contract because the tanks were not built in compliance with industry standards defined by NBS/PS 15–69.[6] It is not seriously disputed that the tanks were not constructed in compliance with the requirements of NBS/PS 15–69.[7] Thiokol contends that the contract incorporated NBS/PS 15–69, and thus appellees breached the contract by failing to build and supply tanks in accordance with these standards.[8]

5. There is considerable support for the rule that contributory negligence is not an appropriate defense to a breach of contract claim. *See* 17A C.J.S. *Contracts* § 525(1), at 1018 (1963). *See also Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1337 (10th Cir.1984) (stating that "contributory negligence has no place in contract and fraud actions"); *Fresno Air Serv. v. Wood*, 232 Cal.App.2d 801, 43 Cal.Rptr. 276, 279 (1965) ("Assumption of risk and contributory negligence ... are not applicable as theories of law and defenses to actions ... for breach of contract."); *Rotman v. Hirsch*, 199 N.W.2d 53, 56 (Iowa 1972) (noting that "contributory negligence would not be available as a defense to an action on contract"); *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, 666 P.2d 192, 199 (1983) ("The use of the comparative negligence theory is not proper in breach of contract actions."); *Broce-O'Dell Concrete Prods., Inc. v. Mel Jarvis Constr. Co.*, 6 Kan.App.2d 757, 634 P.2d 1142, 1145 (1981) ("It is well settled that contributory negligence is no defense to a breach of contract."); *Lee v. Andrews*, 204 Mont. 527, 667 P.2d 919, 921 (1983) (finding use of "comparative negligence principles" in a contract case to be erroneous).

6. These guidelines, promulgated by the National Bureau of Standards, are designed to establish "significant quality requirements for commercially available glass-fiber-reinforced chemical-resistant process equipment for chemical service," by setting the minimum standard for overlapping the layers of woven roving at one inch, establishing minimum tensile strength, and setting forth minimum wall thickness based upon the recognized industry "safety factor of 10 to 1." A safety factor of 10 to 1 requires that each tank be designed to withstand 10 times the expected load.

7. The trial court found that the tanks were under-designed. The design deficiencies included: the seams in the woven roving were not required to overlap by one inch, the tensile strength was below standard, and the design of the tanks failed to provide a 10 to 1 safety factor.

8. In order

[f]or the terms of another document to be incorporated into the document executed by the parties, the reference must be clear and unequivocal, and must be called to the attention of the other party, [the party] must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties; each case must turn on its own facts.

17A C.J.S. *Contracts* § 299, at 136 (1963). *Accord United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 268, 681 P.2d 390, 420 (App.1983). The trial court concluded that the "NBS/PS 15–69 standards were not incorporated into the contract by Thiokol with sufficient clarity ... for the designer and manufacturer to be aware of their application."

Unlike the factual findings, which it does not challenge, Thiokol assails this legal conclusion, contending that the trial court erred as a matter of law because the contract clearly incorporated the aforementioned standards. *See Allstate Ins. Co. v. Liberty Mut. Ins. Group*, 868 P.2d 110, 112

However, regardless of whether the contract incorporated these standards, Thiokol accepted the tanks, being fully aware that the tanks were not manufactured in accordance with NBS/PS 15–69, and thereby waived any subsequent right to claim that the tanks were deficient merely because they did not meet these standards. "Waiver is an intentional relinquishment of a known right. 'It must be distinctly made, although it may be express or implied.'" *Webb v. R.O.A. Gen., Inc.*, 773 P.2d 834, 839 (Utah App.1989) (quoting *Hunter v. Hunter*, 669 P.2d 430, 432 (Utah 1983)). Waiver of a contractual right occurs when a party to a contract intentionally acts in a manner inconsistent with its contractual rights, and, as a result, prejudice accrues to the opposing party or parties to the contract. *See Vessels Oil & Gas Co. v. Coastal Ref. & Mktg., Inc.*, 764 P.2d 391, 392 (Colo.App.1988); *D.M. Ward Constr. Co. v. Electric Corp.*, 15 Kan.App.2d 114, 803 P.2d 593, 596 (1990). *See also Cooper v. Foresters Underwriters, Inc.*, 2 Utah 2d 373, 377, 275 P.2d 675, 677 (1954) (holding defendant did not waive right to enforce contract because defendant's actions were not inconsistent with terms of contract nor did defendant induce belief that it did not intend to enforce terms of contract).

In the instant case, since it approved Fiberglass Structures's proposed design for remedying the defective tanks, supervised the reconstruction of the tanks, and accepted the tanks although aware that they were not constructed in accordance with NBS/PS 15–

69, Thiokol will not now be heard to complain that the tanks failed to meet design or construction specifications allegedly incorporated into the original contract. Accordingly, we hold that the trial court did not err in concluding that appellees did not breach their contracts.

## BREACH OF WARRANTY

We next address Thiokol's contention that the trial court erred by not awarding it damages allegedly caused by appellees' breach of numerous warranties, both express and implied. It is not disputed that appellees provided Thiokol with numerous warranties.[9] Appellees concede that when tank T34 failed on April 30, 1989, Thiokol certainly could have asserted its warranty rights. However, appellees contend that Thiokol's actions after the tank failed preclude it from asserting its warranty rights. We agree.

After tank T34 failed, Thiokol chose to negotiate directly with Fiberglass Structures to replace the damaged tank and reinforce the remaining tanks, without involving Interwest, its contractor, or Palmer, the primary subcontractor. Moreover, Thiokol disregarded the recommendations and warnings of its own engineer concerning the tanks' structural deficiencies and the method of repair. Finally, and most significantly, Thiokol accepted the tanks knowing they were deficient, placed them in operation, and unilaterally modified them.

(Utah App.1994) ("'the interpretation of an unambiguous contract is a question of law which does not require any particular deference to the trial court's interpretation of the contract'") (quoting *LMV Leasing, Inc. v. Conlin*, 805 P.2d 189, 192 (Utah App.1991)). *See also United Cal. Bank*, 681 P.2d at 409 (holding "that the interpretation of a contract is a question of law or, at most, a mixed question of law and fact, neither of which is binding on this court on review"). Moreover, the threshold issue of whether the terms of a contract are ambiguous also presents a question of law, which we review for correctness. *See, e.g., Fitzgerald v. Corbett*, 793 P.2d 356, 358 (Utah 1990).

9. The general contract required that all "items delivered" must "conform to all applicable specifications" and "be merchantable, of good material and workmanship and free from defects." In addition, federal construction warranties incor-

porated into the general contract, and binding on all parties, required the tanks to be "free of any defect of equipment, material, or design," obligated the warrantor to remedy any damage to "real or personal property" resulting from "failure to conform to contract requirements," and gave Thiokol the "right to replace, repair or otherwise remedy" any such damage if the warrantor failed to do so "within a reasonable time."

Moreover, Palmer, on May 2, 1989, expressly warranted its work to be "free of defect in material, equipment, and workmanship for a period of one year." Fiberglass Structures, for its part, warranted that the "structural layer" of the tanks would be constructed according to NBS/PS 15–69 and guarantied "the structural integrity of subject tanks for a period of three years against structural failure through normal non-pressure service." However, normal operating service did not include "modifications to said vessels."

■ Prior to the adoption of Utah's comparative negligence statutes in 1973, *see* Utah Code Ann. §§ 78–27–37 to –43 (1992 & Supp.1994), the Utah Supreme Court held that a plaintiff who deliberately and unreasonably uses a product which he knows to be defective is precluded from recovering damages in an action for breach of express warranty. *See Vernon v. Lake Motors,* 26 Utah 2d 269, 273, 488 P.2d 302, 305 (Utah 1971). Thus, it is clear that prior to the adoption of Utah's comparative negligence statutes, a plaintiff's contributory negligence completely barred recovery in actions for breach of warranty.[10] *See id. See also Ernest W. Hahn, Inc. v. Armco Steel Co.,* 601 P.2d 152, 158–59 (Utah 1979) (stating in dicta that one who unreasonably proceeds to make use of a product knowing it to be defective cannot recover under theories of strict liability or implied warranty).

In *Jacobsen Construction Co. v. Structo–Lite Engineering, Inc.,* 619 P.2d 306 (Utah 1980), the Court addressed Utah's comparative negligence scheme. The facts of *Jacobsen* are remarkably similar to those of the instant case. The plaintiffs, general contractors, brought an action against defendant subcontractors under theories of negligence and breach of warranty for the faulty construction of chemical storage tanks in a water treatment plant. *Id.* at 307. The trial court directed a verdict against the defendants, concluding that the tanks were negligently manufactured as a matter of law. *Id.* at 308. However, in response to special interrogatories submitted to the jury on the defendants' request, the jury reduced the amount of damages in proportion to the amount of negligence attributable to the plaintiffs. *Id.*

On appeal, the defendants claimed that the jury's finding of assumption of the risk precluded any recovery for plaintiffs under theories of negligence and breach of warranty.

*Id.* at 307. The Utah Supreme Court opined that the voluntary and unreasonable assumption of a known risk that once barred recovery "has been abolished by the Utah comparative negligence statute to avoid the harshness visited upon plaintiffs as a result of the all-or-nothing nature of the former rule of law." *Id.* at 309. The Court went on to hold

that under our comparative negligence statute "assumption of risk" language is not appropriate to describe the various concepts previously dealt with under that terminology but is to be treated ... as contributory negligence. Specifically, and with particular reference to our comparative negligence act, the reasonableness of plaintiff's conduct in confronting a known or unknown risk created by defendant's negligence will basically be determined under principles of contributory negligence. Attention should be focused on whether a reasonably prudent man in the exercise of due care would have incurred the risk, despite his knowledge of it, and if so, whether he would have conducted himself in the manner in which plaintiff acted in light of all of the surrounding circumstances, including the appreciated risk. Then, *if plaintiff's unreasonableness is viewed to be less than that of defendant,* according to the terms of the statute, "any damages allowed shall be diminished in proportion to the amount of negligence attributable to the person recovering."

*Id.* at 312 (emphasis added) (footnote & citation omitted) (quoting statutory provision then in effect). Because the jury had determined that the defendants were seventy percent at fault while the plaintiffs were thirty percent at fault, plaintiffs' damages were appropriately reduced by thirty percent—the proportion of fault attributable to their own negligence. *Id.* at 308, 312.

---

10. Although commentators may not agree on the final characterization of a warranty action, they do agree that it had its inception in tort law and retains tort characteristics to this day. *See* William L. Prosser, *The Implied Warranty of Merchantable Quality,* 27 Minn.L.Rev. 117, 118–19 (1943); Jacqueline S. Bollas, Note, *Use of the Comparative Negligence Doctrine in Warranty Actions,* 45 Ohio St.L.J. 763, 766 (1984). Accordingly, contributory or comparative negligence remains a valid defense in a breach of warranty action. *See Jacobsen Constr. Co. v. Structo–Lite Eng'g, Inc.,* 619 P.2d 306, 312 (Utah 1980); *Vernon v. Lake Motors,* 26 Utah 2d 269, 273, 488 P.2d 302, 305 (Utah 1971). This precept has been codified in Utah. *See* Utah Code Ann. §§ 78–27–37(2), –38 (Supp.1994).

In addition, the defendants in *Jacobsen*, like appellees in the instant case, claimed that the plaintiffs' assumption of a known risk barred any recovery for breach of warranty. However, the *Jacobsen* court did not reach that issue.[11] While *Jacobsen* is silent on whether principles of comparative fault should be extended to breach of warranty cases, the comparative negligence statutes leave little doubt that the Legislature intended to include assumption of risk as a defense to breach of warranty, albeit subject to comparative apportionment rather than as a complete bar to recovery.

In this regard the statutes provided, at the time of trial,[12] in pertinent part, as follows:

"Fault" means any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all its degrees, contributory negligence, *assumption of risk*, strict liability, *breach of express or implied warranty of a product*, products liability, and misuse, *modification* or abuse of a product.

Utah Code Ann. § 78–27–37(2) (1992) (emphasis added).

The fault of a person seeking recovery shall not alone bar recovery by that person. *He may recover from any defendant or group of defendant's whose fault exceeds his own.* However, no defendant is liable to any person seeking recovery for any amount in excess of the proportion of fault attributable to that defendant.

*Id.* § 78–27–38 (emphasis added).

The trial court may, and when requested by any party shall, direct the jury, if any, to find separate special verdicts determining the total amount of the damages sustained and the percentage or proportion of fault attributable to each person seeking recovery and to each defendant.

*Id.* § 78–27–39.

■ The plain language of these provisions makes clear that a court shall consider a plaintiff's comparative negligence and comparative assumption of the risk in determining liability for a claim of breach of warranty. The statutes also contemplate that if a plaintiff's proportion of fault is less than that of a defendant, or group of defendants, the factfinder is required to determine "the percentage or proportion of fault attributable to each party seeking recovery and to each defendant," *id.*, and reduce the award of damages accordingly. However, if a plaintiff's share of fault exceeds defendant's, plaintiff recovers nothing.

■ Given the facts of the instant case, a specific finding allocating proportionate fault among the parties is unnecessary. Thiokol cannot recover for breach of warranty if its own fault exceeds that of appellees. The unchallenged factual findings indicate that Thiokol was primarily at fault for the tank's failure. Thiokol developed the contract specifications (which were met by appellees), accepted the tanks knowing that they were deficient, modified the method by which the tanks were filled, and then overfilled the tank that eventually ruptured. The trial court found that Thiokol's modification of the tanks allowed Thiokol to overfill tank T33, and that such overfilling actually caused the tank to rupture. Therefore, because Thiokol, and not appellees, was primarily at fault for the tank's deficiencies, Thiokol is precluded from recovering from appellees for breach of warranty.

## DISMISSAL OF TORT CLAIMS

Finally, Thiokol claims the trial court erred in disregarding its tort-based theories

---

11. The Court did not address this claim because the same conduct of the defendants prompted the claims of both negligence and breach of warranty, and the jury had already apportioned the fault of each party without differentiating between the claims. Since the jury was instructed that the damages arising from breach of warranty were identical to the damages claimed from the negligent construction of the tanks, there was no need to separately address the warranty claim in the apportionment of fault. *See Jacobsen*, 619 P.2d at 312.

12. Portions of these statutory provisions have been subsequently amended, but none of the changes appear to have any bearing on our analysis. *See* Utah Code Ann. §§ 78–27–37(2), –38(1) & (2), –39(1) (Supp.1994).

and summarily dismissing its claims of negligence and strict liability. The court dismissed Thiokol's tort claims because it concluded that the case was "entirely controlled by contract."

In *Beck v. Farmers Insurance Exchange,* 701 P.2d 795 (Utah 1985), the Utah Supreme Court addressed the often-blurred distinction between tort and contract liability. *Id.* at 799–800. The Court clarified this distinction by holding that if parties arrange rights, duties, and obligations under a contract, any cause of action for breach of those contractually defined obligations, rights, or duties lies in contract, not in tort. *Id.* In the words of the Court, when "the duties or obligations of the parties are contractual rather than fiduciary ... a breach of those express or implied duties can give rise only to a cause of action in contract, not one in tort." *Id.* at 800.

■■■■■■ However, tort liability is not always precluded just because there is a contract between a plaintiff and a defendant. *See id.* at 800 n. 3. In some cases an act or omission resulting in a breach of contract may also constitute a breach of duty that is not subsumed by the contract and may thereby give rise to a cause of action sounding in tort. *Id.* Consequently, a party may recover in tort for breaches of duties which are independent of contract terms. *See id.* (giving examples of fraud and intentional and outrageous conduct). *See also Culp Constr. Co. v. Buildmart Mall,* 795 P.2d 650, 654–55 (Utah 1990) (noting that statutory requirements, such as provisions prohibiting unfair competition, may give rise to independent tort actions, despite existence of duties expressly or implicitly defined by contract).

■■■ In the instant case, Thiokol claims appellees negligently constructed and supplied a defective product and also that appellees should be held strictly liable for supplying an ultra-hazardous product. In order to maintain its tort claims, Thiokol must show that appellees' acts or omissions resulted in breach of an independent duty not already defined by contract. *See Beck,* 701 P.2d at 799–800.

■■ Although couched in the language of negligence and strict liability, Thiokol's tort claims are the same as its contractual claims, i.e., Thiokol contends appellees designed, manufactured, and supplied a defective product. Thiokol's negligence claims assert that appellees breached their duty of care by providing tanks that were defective in design and manufacture and were inadequate for the purpose for which they were constructed. Likewise, Thiokol's strict liability claims assert that appellees designed, manufactured, and supplied defective tanks and created an unreasonably dangerous condition. However, the contract expressly provided that appellees were under a duty to design, construct, and deliver a product free from defects and suitable for the purposes for which it was to be used. Thus, appellees' responsibility in tort is, on the facts of this case as found by the trial court, exactly co-extensive with their contractual obligations. In any event, Thiokol has failed to demonstrate appellees breached any duties, rights, or obligations *independent* of those imposed upon them under contract. Accordingly, the trial court correctly dismissed Thiokol's tort claims.

## CONCLUSION

The trial court correctly concluded that appellees did not breach their contracts. Thiokol concedes it is unable to successfully challenge the court's factual finding that appellees designed, manufactured, and supplied the tanks according to the requirements of the contract. The trial court's explanation that Thiokol was actually at fault for the failure of tank T33 does not obviate the court's conclusion that appellees fulfilled their obligations under the contract. Moreover, the trial court correctly concluded that Thiokol's knowing acceptance of a defective product, and its subsequent modification and negligent operation of that product, prevent it from recovering damages for breach of express or implied warranty. Finally, the trial court correctly dismissed Thiokol's claims of negligence and strict liability where such claims were based on alleged violations of duties that are indistinguishable from the

duties contractually created among the parties. Accordingly, we affirm.

DAVIS, J., concurs.

BENCH, Judge (concurring and dissenting):

I concur generally in the main opinion's treatment of the breach of contract and breach of warranty claims. I dissent, however, from the main opinion's decision to uphold the trial court's summary dismissal of Thiokol's negligence and strict liability claims.

The main opinion argues that because the appellees' responsibility in tort is, on the facts found by the trial court, "exactly co-extensive with their contractual obligations," the appellees cannot be liable in tort. In so stating, the main opinion misapplies the controlling case of *DCR Inc. v. Peak Alarm Co.,* 663 P.2d 433 (Utah 1983).

In *DCR,* the parties entered into a contract that required the defendant to install and maintain a burglar alarm in the plaintiff's clothing store. After the alarm was installed, a burglary occurred in the plaintiff's store resulting in an inventory loss of $55,000. The burglar deactivated the plaintiff's alarm using a simple well-known deactivation technique. The defendant knew about the deactivation technique and also knew of an easy and inexpensive way to prevent the deactivation, but failed to warn the plaintiff about the risk. The plaintiff brought an action against the defendant in negligence and on the contract. The Utah Supreme Court addressed the question of whether the negligence of a party to a contract can give rise to both contract and tort claims.

This Court has defined negligence as a failure to exercise the degree of care which a reasonable person would have exercised under the same circumstances, whether by acting or by failing to act. In cases where the alleged negligence consists of a failure to act, the person injured by another's inaction must demonstrate the existence of some special relationship between the parties creating a duty on the part of the latter to exercise such due care in behalf of the former.... Similarly, contractual relationships for the performance of services impose on each of the contracting parties a general duty of due care toward the other, apart from the specific obligations expressed in the contract itself. The care to be exercised in any particular case depends upon the circumstances of that case and on the foreseeable danger involved and must be determined as a question of fact.

*A party who breaches [its] duty of care toward another may be found liable in tort, even where the relationship giving rise to such a duty originates in a contract between the parties.*

*Id.* at 434–35 (emphasis added) (footnotes omitted).

The supreme court cited with approval *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980)[1] and *Flint & Walling Manufacturing v. Beckett,* 167 Ind. 491, 79 N.E. 503 (1906).[2] The supreme court also quoted an article by Pro-

If a defendant may be held liable for the neglect of a duty imposed on him, independently of any contract, by operation of law, a fortiori ought he to be liable where he has come under an obligation to use care as the result of an undertaking founded on a consideration.... In some cases this ground of liability may coexist with a liability on contract towards the same person, and arising (as regards the breach) out of the same facts. ... And this duty is not affected by the fact, if so it be, that he is acting for reward, in other words, under a contract, and may be liable under the contract. The two duties are distinct.

*DCR,* 663 P.2d at 435–36 (quoting *Flint,* 79 N.E. at 505–06).

---

**1.** In *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980), the California Supreme Court explained the difference between a tort action for breach of a duty arising as a result of a contractual relationship and a contract action for breach of an express duty contained in the contract itself:

[A] wrongful act committed in the course of a contractual relationship may afford both tort and contractual relief, and in such circumstances the existence of the contractual relationship will not bar the injured party from pursuing redress in tort.

*DCR,* 663 P.2d at 435 (quoting *Tameny,* 164 Cal.Rptr. at 843, 610 P.2d at 1334).

**2.** In *Flint & Walling Mfg, Co. v. Beckett,* 167 Ind. 491, 79 N.E. 503 (1906), the Indiana Supreme Court similarly addressed this distinction:

fessor Carl S. Hawkins, to the following effect:

> The "duty" concept limits defendants' liability to claims arising out of particular relationships and risks. In professional negligence cases, a contract with the client most often creates the relationship from which the duty of care arises. However, the defendant's tort liability is not based upon breach of contract, but rather upon violation of the legal duty independently imposed as a result of what the defendant undertook to do with relation to the plaintiff's interests.

*DCR*, 663 P.2d at 436–37 (quoting Carl S. Hawkins, *Retaining Traditional Tort Liability in the Nonmedical Professions*, 1981 B.Y.U.L.Rev. 33, 36).

The supreme court concluded that the defendant's duty to warn the plaintiff of the vulnerability of the alarm system did not arise from any promise contained within the four corners of the contract. Instead,

> the duty as it exists in this case is derived from defendant's general duty of due care which accompanies its ongoing contractual relationship with plaintiff for service and maintenance of the alarm system. Thus, plaintiff's allegation of failure to warn provides the basis for a cause of action in tort which is entirely separate from any contract-based claims which plaintiff might present.

*Id.* at 437. Although the defendant was not liable in contract, the supreme court held that the defendant might be liable in tort for a breach of its duty to exercise due care towards the plaintiff.

Contrary to the main opinion's position in this case, a determination that Thiokol's claims do not give rise to breach of contract, does not, as a matter of law, preclude Thiokol's claims of negligence based on duties arising as a result of the contractual relationships. The contractual relationships between Thiokol and its contractors and subcontractors gave rise to a duty of due care between the parties. Thiokol's negligence claims go to this duty of due care and not to the contractual duties. The main opinion therefore errs in concluding that the failure of Thiokol's contract claims necessarily defeats

Thiokol's negligence claims. Whether appellees have breached their duty of due care is inherently factual in nature and cannot be determined as a matter of law. *See id.* at 435.

Similarly, the failure of Thiokol's contractual claims do not, as a matter of law, preclude its strict liability claims. Strict liability does not depend upon the existence of a contract between the parties. *See, e.g., Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152, 156 (Utah 1979) ("Strict liability ... [does] not rest on a consensual foundation but, rather, on one created by law.") (quoting *Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 383–84, 575 P.2d 1162, 1165–66 (1978)); Restatement (Second) of Torts § 402A(2)(b) (1965). The supreme court in *Hahn* discussed the origin of strict liability and stated, in pertinent part:

> [T]he concept of strict products liability was created and shaped judicially. In its evolution, the doctrinal encumbrances of contract and warranty, and the traditional elements of negligence, were stripped from the remedy, and a new tort emerged which extended liability for defective product design and manufacture beyond negligence but short of absolute liability.

*Id.* The supreme court adopted Section 402A of the Restatement of Torts, which provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> (a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relationship with the seller.

*Hahn*, 601 P.2d at 156. (quoting Restatement (Second) of Torts § 402A (1965)). Because Thiokol's strict liability claims are not precluded by its failure on its contract claims, and because any determination of strict liability is fact specific, I believe the main opinion errs by precluding Thiokol's strict liability claims as a matter of law.

I would therefore reverse the trial court's summary dismissal of Thiokol's negligence and strict liability claims and remand this case to allow Thiokol an opportunity to try to prove those claims.