(803 P.2d 593)

No. 64,824

D.M. WARD CONSTRUCTION COMPANY, INC., *et al.*, *Appellant*, v. ELECTRIC CORPORATION OF KANSAS CITY, *Appellee*.

Opinion
filed December 28, 1990.

*Bruce Keplinger*, of Payne & Jones, Chartered, of Overland Park, for
appellant.

*Patrick D. McAnany* and *Douglas M. Greenwald*, of McAnany, Van Cleave
& Phillips, P.A., of Lenexa, for appellee.

Before LARSON, P.J., DAVIS, J., and RICHARD W. WAHL, District
Judge Retired, assigned.

WAHL, J.: This is a contract dispute between Electric Cor-
poration of Kansas City (Electric Corp.) and D.M. Ward Con-
struction Co., Inc. (Ward). Ward appeals the trial court's
judgment refusing to compel arbitration of this dispute and re-
fusing to grant Ward a setoff from the judgment entered for
Electric Corp.

In 1985, Ward, a general contractor, contracted with Distron,
Inc., a division of Burger King Corporation, to build a warehouse-
distribution center in Kansas City, Kansas. Ward selected Electric
Corp. as the electrical contractor for the project, and the parties
entered into a written subcontract on September 30, 1985. Ward
supplied the American Institute of Architects standard form sub-
contract agreement that the parties used. The subcontract con-
tained a provision stating: "All claims, disputes and other matters
in question arising out of, or relating to, this subcon-
tract . . . shall be decided by arbitration."

The warehouse was to contain office space, storage space, and
large drive-in refrigerator and freezer units which occupied ap-

proximately 30 or 40 percent of the floor space of the warehouse. The refrigerated portions of the warehouse were to be cooled by a computerized ammonia cooling system, which included a sensitive ammonia detection system.

During construction, Electric Corp. was called upon to perform several tasks which were not included in the subcontract with Ward. Ward also requested Electric Corp. to install temperature control wiring for the ammonia system, believing such wiring to be part of Electric Corp.'s subcontract. Electric Corp. disputed this claim, arguing the only temperature control wiring it agreed to install was that relating to the heating and cooling systems for the office area. Electric Corp. believed the temperature control wiring for the ammonia system was the responsibility of the refrigeration contractor, Preston Refrigeration. Ward eventually hired another electrical contractor, Broadway Electrical Construction (Broadway), to install the ammonia system wiring.

Electric Corp. completed its work on the warehouse on January 14, 1987, but as of March 23, 1987, had not been paid the full contract price or for the extra work performed, so Electric Corp. filed a mechanic's lien against the property. Ward made further payments to Electric Corp. after the lien was filed, but still owed Electric Corp. approximately $20,000 a year later. Electric Corp. brought suit against Ward and Burger King in March 1988 to collect the balance due. Ward filed an answer on April 11, 1988, but the answer did not mention the arbitration clause of the subcontract.

In December 1988, following discovery, the court set the matter for trial on January 10, 1989, then on December 21, 1988, reset trial for February 7, 1989. On January 3, 1989, Ward filed a motion to compel arbitration and stay the trial court's proceedings pursuant to K.S.A. 5-402(a). The appearance docket indicates the trial court denied this motion on January 20, 1989, but no journal entry was filed.

Ward's defenses at trial were that Electric Corp. had not adequately performed under the contract, that it did not promptly submit some of the bills for the extra work in a timely manner as required by the subcontract, and that Electric Corp.'s labor charges were unreasonable. Ward also claimed a setoff for

amounts paid to Broadway to complete the temperature control wiring for the ammonia system.

The trial court ·found the subcontract was ambiguous on whether Electric Corp. was required to install the ammonia system temperature control wiring and construed the contract strictly against Ward. The trial court also found Electric Corp.'s charges were reasonable and its billings were timely submitted, except for two items which were billed late. The trial court found, however, the late billing on these items did not prejudice Ward and thus allowed Electric Corp. to recover for them. The trial court entered judgment in favor of Electric Corp. for $23,932.46.

Ward filed a post-trial motion to alter or amend the judgment, alleging K.S.A. 5-402(a) required the trial court to compel arbitration when it was requested by Ward. Ward also argued that the trial court erred in not allowing a setoff based on the undisputed evidence at trial that the parties had a clear understanding of what the term "temperature control wiring" meant. The trial court denied Ward's motion in total and Ward timely appeals.

On appeal, Ward argues the trial court erred in refusing to compel arbitration because: (1) the subcontract requires arbitration of all disputes; (2) K.S.A. 5-402(a) requires the trial court to compel arbitration when requested by a party; (3) arbitration agreements are statutorily recognized and their enforceability supported by Kansas case law; and (4) Ward did not waive its right to arbitration. Electric Corp. contends Ward's tardy attempt to compel arbitration was barred by waiver, estoppel, or laches.

Waiver is "an intentional renunciation of a claim or right and exists only where there has been some absolute action or inaction inconsistent with that claim or right." *Proctor Trust Co. v. Neihart,* 130 Kan. 698, 705, 288 Pac. 574 (1930). Waiver of a contract right " 'implies a voluntary and intentional renunciation of it, and some positive act or positive inaction inconsistent with ,the contract right is necessary to create a waiver. [Citations omitted.]' " 130 Kan. at 705. See *Rice v.. Hillenburg,* 13 Kan. App. 2d 155, 161, 766 P.2d 182 (1988), *rev. denied* 244 Kan. 738 (1989).

There is no journal entry in the record denying Ward's motion to compel arbitration. However, the trial court explained its reason for denying the motion in its decision denying Ward's post-

trial motion to alter or amend the judgment. The journal entry provides:

"[T]he court originally denied the defendant's request for arbitration, due to the fact that the trial was set to commence on February 2, 1989, and the motion to compel arbitration was not filed and brought to the attention of the court until January 3, 1989. The court found at that time that provisions for arbitration are generally included in contracts so that matters might be settled in shorter periods of time, and to grant arbitration in this case would have the effect of actually delaying the process of adjudication of the dispute. The court finds no sufficient reason to disturb that prior ruling on this issue."

K.S.A. 5-402(a) clearly requires a trial judge to stay court proceedings and compel arbitration when the parties have entered into a binding agreement to arbitrate disputes. In this respect, Kansas law is virtually identical to the provisions of the Federal Arbitration Act. See 9 U.S.C. § 2, 3 (1988). In *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 218, 84 L. Ed. 2d 158, 105 S. Ct. 1238 (1985), the Court held that, where parties have agreed to arbitrate disputes, district courts have no discretion to refuse to enforce arbitration clauses absent grounds for revocation of the agreement. However, in *Jackson Trak Group, Inc. v. Mid States Port Authority,* 242 Kan. 683, 751 P.2d 122 (1988), the Kansas Supreme Court recognized that the conduct of a party that is inconsistent with the treatment of a contractual arbitration provision, or conduct that a court could reasonably construe as evidencing a lack of intent to take advantage of an arbitration provision, may amount to the waiver of a right to arbitrate. 242 Kan. at 693. The court specifically recognized that a right to arbitrate may be waived "by [a party] being unjustifiably slow in seeking arbitration." 242 Kan. at 693. However, the court found no waiver in that case where the party against whom waiver was asserted had filed an application for an injunction and replevin of property it alleged was wrongfully converted, while specifically reserving the right to arbitrate the issue of damages for the conversion of the property. 242 Kan. at 693.

While *Jackson Trak* recognized that a contractual right to arbitration could be waived by failing to timely seek arbitration, the court did not specify an appellate scope of review on this issue. The parties in this case disagree on this court's scope of

review. Ward urges this court to apply a de novo standard, since the issue of whether the dispute should have gone to arbitration is determined by a construction of the written subcontract. Alternatively, Ward argues the same standard applies because both parties "stipulated" as to the existence of the arbitration clause. Electric Corp. argues the trial court's finding that Ward waived its right to arbitration is a question of fact which is supported by substantial evidence and should not be overturned on appeal absent an abuse of discretion.

Both parties' contended standards of appellate review fall short. Ward's position that the de novo standard applies is not correct because the contract clearly requires arbitration of all disputes and no construction of the agreement is required. The only disputed question on this appeal is whether Ward waived its right to arbitration.

Electric Corp.'s position that the trial court's finding of waiver is a factual question is not entirely satisfactory either. Whether a contract right is waived is a legal conclusion, but the conclusion is dependent on facts found by the trial court. In *Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1158 (5th Cir. 1986), the Fifth Circuit Court of Appeals summarized federal cases regarding the proper scope of review of a finding of waiver, noting some jurisdictions treat the question as one of fact subject to the "clearly erroneous" standard of review, while others treat it as a question of law subject to "plenary" review. 791 F.2d at 1159. The court adopted a mixed approach, stating: "[A] finding that a party has waived its right to arbitration is a legal conclusion subject to our plenary review, *but* that the findings upon which the conclusion is based are predicate questions of fact, which may not be overturned unless clearly erroneous." 791 F.2d at 1159. This statement of the scope of appellate review is in accord with Kansas law on findings of fact and conclusions of law. See *Williams Telecommunications Co. v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988).

While no Kansas case has specifically stated what actions constitute waiver of a contractual right to arbitration, several federal and state decisions have held that participation in a lawsuit without reserving the right to arbitrate by raising it in the answer or reasonably soon thereafter constitutes waiver. In *Price v. Drexel*

*Burnham Lambert Inc.*, 791 F.2d at 1162, the court held arbitration was waived where the party seeking to compel arbitration had filed answers and motions, moved for extension of pretrial deadlines, and initiated extensive discovery before filing a motion to compel arbitration seventeen months later. In *Lounge-A-Round v. GCM Mills, Inc.*, 109 Cal. App. 3d 190, 201-02, 166 Cal. Rptr. 920 (1980), the defendant was held to have waived arbitration by answering and filing a cross-claim while waiting nine months before moving to compel arbitration. See Annot., 98 A.L.R.3d 767; 5 Am. Jur. 2d, Arbitration and Award §§ 51, 52.

Several early cases held that merely answering to the merits of a claim constituted waiver of the right to arbitrate. See Annot., 98 A.L.R.3d 767 §§ 3, 4. Since those early cases, many states, including Kansas, have adopted the Uniform Arbitration Act, and Congress has adopted the Federal Arbitration Act. As a result of the strong state and federal policies favoring arbitration, many recent decisions have abandoned the rationale of the early cases and impose a heavy burden on the party opposing arbitration. See, *e.g.*, *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023, 1025 (11th Cir. 1982). Many courts now conclude that the essential issue in determining whether a party has waived its right to arbitration "is not whether the moving party's actions have been consistent with arbitration, but rather, whether prejudice would occur to the party opposing arbitration." *County of Clark v. Blanchard Constr. Co.*, 98 Nev. 488, 491, 653 P.2d 1217 (1982). See *Page v. Moseley, Hallgarten, Estabrook & Weeden*, 806 F.2d 291, 293 (1st Cir. 1986); *New Linen Supply v. Eastern Environmental Controls, Inc.*, 96 Cal. App. 3d 810, 814, 158 Cal. Rptr. 251 (1979); *Matthews-McCracken Rutland Corp., Etc.*, 414 So. 2d 756, 757 (La. 1982); *United Nuclear Corp. v. General Atomic Co.*, 93 N.M. 105, 115, 597 P.2d 290 (1979).

In *Price*, the court stated " '[w]aiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party.' " 791 F.2d at 1158.

In another case from the Fifth Circuit, the court found no prejudice to the non-moving party where the party insisting on arbitration indicated his desire to arbitrate in his original answer, maintained that position during discovery, and only minimal dis-

covery was conducted. *Tenneco Resins, Inc. v. Davy Intern., AG*, 770 F.2d 416, 421 (5th Cir. 1985).

*Peterson v. Shearson/American Exp., Inc.*, 849 F.2d 464 (10th Cir. 1988), lists six factors to be used in determining whether a party has waived the right to arbitration. These are:

"(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether 'the litigation machinery has been substantially invoked' and the parties 'were well into preparation of a lawsuit' before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) 'whether important intervening steps [*e.g.*, taking advantage of judicial discovery procedures not available in arbitration] had taken place'; and (6) whether the delay 'affected, misled or prejudiced' the opposing party. [Citations omitted.]" 849 F.2d at 467-68.

Applying the *Peterson* tests to the evidence in this case, Ward's actions were inconsistent with its later assertion of the right to arbitrate. Electric Corp.'s petition was filed on March 2, 1988. Ward answered on April 11, 1988, but the answer gave no indication that Ward desired to arbitrate. The trial court was not aware that Ward claimed a right to arbitration until Ward's motion was filed on January 3, 1989, ten months after the action was filed.

The litigation machinery does not appear to have been substantially invoked by the time Ward notified Electric Corp. that it desired to arbitrate this dispute. Ward notified Electric Corp. of its desire to arbitrate in letters dated September 13, 1988, October 4, 1988, and December 2, 1988. Electric Corp. argues these letters cannot be considered on appeal because they were not made a part of the record below. *American States Ins. Co. v. Hanover Ins. Co.*, 14 Kan. App. 2d 492, 493, 794 P.2d 662 (1990). While Supreme Court Rule 6.02(f) (1990 Kan. Ct. R. Annot. 25) states that an appendix to an appellant's brief "is not to be considered a substitute for the record itself," there is some evidence in the record that Ward requested Electric Corp. to arbitrate this dispute as early as September 13, 1988. Ward's memorandum in support of its motion to compel arbitration discloses that Ward's attorney sent Electric Corp.'s counsel letters requesting arbitration on September 13, 1988, and October 4,

1988, but received no response. The memorandum also states that Ward's counsel first received notice that Electric Corp. refused to arbitrate in December 1988. In Electric Corp.'s response to Ward's motion to compel arbitration, Electric Corp.'s counsel admits that Ward asserted its right to arbitration in September 1988. This fact is also admitted in Electric Corp.'s brief. Most of the legal proceeding prior to September 1988 involved Burger King's failed attempt to be dismissed from the lawsuit. It is not clear from the record whether the parties were well into preparation of their court case before Ward notified Electric Corp. of its desire to arbitrate. The record does disclose that discovery was essentially complete prior to the time Ward filed its motion to compel arbitration with the trial court.

Ward's request for arbitration enforcement, filed January 3, 1989, came very close to the trial date, which had been set for February 7, 1989.

Ward did not file a counterclaim before requesting a stay of the proceedings. Ward's claim for setoff was asserted only after the trial judge denied Ward's request for a stay.

Ward conducted some discovery prior to filing its motion to compel arbitration. The record shows Ward filed a request for production of documents on October 6, 1988.

Ward's tardy request for arbitration did prejudice Electric Corp. since Electric Corp. had already conducted a substantial amount of discovery in preparation for trial. This reason was employed by the court to find prejudice to the non-moving parties in *United States, Etc. v. S.T.C. Const. Co.*, 472 F. Supp. 1023 (E.D. Pa. 1979), where the court affirmed the trial court's decision finding the defendant waived arbitration. In that case, the defendant waited nineteen months before raising arbitration as a defense or requesting a stay of the court proceedings. The defendant actively participated in discovery and had filed a counterclaim against one of the defendants. The court found prejudice to the non-moving parties because granting the defendant's tardy motion would require the parties to prepare for arbitration after having prepared to settle their dispute in court. 472 F. Supp. at 1025.

The trial court's conclusion that Ward waived its right to arbitrate is supported by facts based on substantial competent evidence and must be affirmed.

Ward argues the trial court erred in denying its claim to set off $15,684 from the judgment for the amount of money it had to pay Broadway to complete the ammonia system temperature control wiring. Ward argues the testimony of Mark Ward, the president and part-owner of defendant Ward Construction Co., was uncontroverted and therefore conclusively established that the parties reached a clear understanding that Electric Corp. was contractually obligated to do the ammonia system wiring. Electric Corp. counters that Ward's testimony was not uncontroverted, but was merely a portion of the total evidence which the trial court had to consider.

Central to this issue is the trial court's finding that the subcontract was ambiguous. The contract clearly required Electric Corp. to do *some* temperature control wiring. The issue in dispute was whether the term "temperature control wiring" as used by the parties included temperature control wiring for the ammonia cooling system, which came under the refrigeration section of the subcontract and had a different set of specifications. If Electric Corp. was contractually obligated to do the ammonia system temperature control wiring and it breached the contract, Ward would be entitled to set off the amount it paid Broadway to complete the work. See *Phelps Dodge Copper Products Corp. v. Alpha Construction Co.,* 203 Kan. 591, Syl. ¶ 4, 455 P.2d 555 (1969). Ward's argument, however, does not directly challenge the trial court's finding that the subcontract was ambiguous. Rather, Ward alleges the trial court erred because it disregarded Mark Ward's uncontroverted testimony regarding what the parties intended. This argument is without merit.

The uncontroverted testimony Ward refers to was Mark Ward's testimony at trial that the parties had agreed temperature control wiring was included in Electric Corp.'s bid. Ward admitted on the stand that the initial drawings and specifications were not clear on whether the ammonia system temperature control wiring was to be done by the electrical contractor or the refrigeration contractor. Ward testified he had a conversation with someone he was "pretty sure" was Daryl Stine, Electric Corp.'s president,

and asked him whether temperature control wiring was included in Electric Corp.'s bid. Stine allegedly told Ward it was. However, nothing in Ward's testimony specifically states that Electric Corp. agreed to do the ammonia system temperature control wiring or whether Stine was referring to the temperature control wiring for the heating and cooling systems for the office area. Larry Osborn testified for Electric Corp. and stated that Electric Corp.'s bid did include temperature control wiring, but only for the office heating and cooling systems. Thus, the issue to be determined by the trial court was what the parties intended by use of the term "temperature control wiring."

Ward argues that, since Stine was present at trial but did not testify, the trial court was required to accept Mark Ward's interpretation of what "temperature control wiring" meant. As authority for its position, Ward relies upon language from *Home Life Ins. Co. v. Clay*, 13 Kan. App. 2d 435, 444, 773 P.2d 666, *rev. denied* 245 Kan. 783 (1989), which stated: " 'uncontroverted evidence which is not improbable or unreasonable cannot be disregarded . . . unless it is shown to be untrustworthy; and such uncontradicted evidence should ordinarily be regarded as conclusive.' " This is a correct statement of the law, but Ward seeks to apply it incorrectly. Mark Ward's testimony was controverted at trial by Osborn. The trial court also heard the testimony of an architect called as an expert witness by Electric Corp. in rebuttal, who testified that, based upon his experience with construction contracts, the term "temperature control wiring" meant "HVAC [heating, ventilating, air conditioning] wiring" such as that used for the office heating and cooling systems. The expert also noted that the ammonia system temperature control wiring came under a special section of the subcontract separate and apart from the electrical section, and, in his opinion, the refrigeration contractor was responsible for the ammonia system temperature control wiring. Mark Ward's testimony was not controverted by Stine, but it was controverted by other witnesses for Electric Corp. Ward cites no authority for its claim that such testimony must be contradicted by the person spoken to or such testimony shall be considered to be uncontroverted. We know of no such authority.

Ward's final argument attempts to establish entitlement to 60-70 percent of the setoff claim. This argument is based on the testimony of Electric Corp.'s expert witness regarding the commonly accepted meaning of the term "temperature control wiring." The expert testified the term generally referred to heating, ventilating, and air conditioning wiring, such as the wiring installed in the office portion of the warehouse. The expert stated on cross-examination that he generally agreed with Ward's attorney's suggestion that 60 to 70 percent of the warehouse did not consist of refrigerated space. Ward then concludes the expert agreed "that 60 to 70 percent of *the work in dispute* was not for the refrigeration system;" (emphasis added) consequently, even accepting the expert's opinion that the term "temperature control wiring" did not include work on the refrigeration system, Ward should be entitled to 60 to 70 percent of its setoff claim.

This argument misstates the expert's testimony. The work in dispute was the temperature control wiring for the refrigeration system. Electric Corp.'s expert testified that, in his opinion, the subcontract did not require Electric Corp. to do this wiring. While the expert agreed that 60 to 70 percent of the warehouse was not refrigerated, he did not testify that 60 to 70 percent of *the work in dispute* was Electric Corp.'s responsibility. Ward's argument suggests that Electric Corp. did not perform its contractual obligations with regard to the nonrefrigerated portions of the warehouse. This argument is without merit. There is no evidence in the record to support it.

The judgment of the trial court is affirmed.