**COLGAN AIR, INC. Plaintiff,**

v.

**RAYTHEON AIRCRAFT COMPANY Defendant.**

No. 1:05CV213.

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 7, 2005.

Morgan Warren Campbell, Dombroff & Gilmore PC, McLean, VA, for Plaintiff.

Holly Parkhurst Essing, Robert Taggart Hall, Hall & Sickel PC, Reston, VA, for Defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

This negligence and breach of warranty action arises out of the crash of a Beech 1900D aircraft, FAA Registration No. N240CJ ("Aircraft N240CJ"), off the Massachusetts coast on August 26, 2003. It is brought by Colgan Air, Inc. ("Colgan"), the air carrier that leased the aircraft, against Raytheon Aircraft Company ("Raytheon"), the manufacturer of the aircraft and the issuer of the aircraft's maintenance manual. Although not named, the real plaintiff in interest is AIG, the entity that, pursuant to the lease arrangement, issued a policy insuring against the loss of the aircraft and then, when the aircraft crashed, paid the proceeds of the policy to the lessee. AIG thereby became subrogat-

ed to any rights Colgan might have with respect to the loss of the aircraft.

Raytheon has moved for summary judgment, and Colgan has moved for partial summary judgment. The essential dispositive questions presented are:

(1) whether the waiver of right contained in the Used Airliner Warranty provided by Raytheon to Colgan pursuant to the lease agreement is effective to bar claims for loss of the aircraft; and

(2) if so, whether the waiver of rights also precludes Colgan's claims based on a defective maintenance manual on the ground that the maintenance manual is an integral part of the aircraft.

## I.[1]

The plaintiff, Colgan, is a regional air carrier incorporated and headquartered in Virginia. It seeks to recover damages allegedly sustained as a result of the crash of an aircraft it leased from Raytheon Aircraft Credit Corporation ("RACC"), and RACC's wholly owned subsidiary Raytheon Airline Aviation Services LLC ("RAAS"). The aircraft was manufactured by the defendant, Raytheon, a Kansas corporation, which also issued the maintenance manuals for the aircraft. RACC is sister company of Raytheon as both are wholly owned subsidiaries of Raytheon Holdings, Inc. RAAS is a wholly owned subsidiary of RACC.

On August 25 and August 26, 2003, Colgan's maintenance employees replaced Aircraft N240CJ's forward elevator trim tab cable after the existing cable had come off of the drum and kinked as a result of earlier maintenance performed on the aircraft. While the parties dispute the cause, it is undisputed that Colgan's maintenance personnel, using the aircraft maintenance manual then in effect, incorrectly installed the trim tab cable such that the trim tabs operated in reverse. As a result, when cockpit controls were used to set the trim tabs at a nose up position, the trim tabs actually moved to a nose down position. This dangerous condition was not discovered by Colgan's maintenance crew during their post-maintenance operational checks, nor was it discovered by Colgan's pilots in their checks before attempting their ill-fated flight. Thus, when the pilots attempted take-off, the reversal of the trim tabs caused the aircraft to crash off the coast of Hyannis, Massachusetts, killing both of the pilots and destroying the aircraft.

Colgan assigns the blame for the accident to an allegedly defective maintenance manual provided to it by Raytheon. The manual at issue, Revision 9 of the Raytheon Electronic Publications Program Maintenance Library for the Beech 1900 Aircraft ("REPS Manual"), was provided in electronic format and received by Colgan on or about May 23, 2003.[2] The REPS Manual contained a section within Chapter 27 entitled "Flight Controls–Description and Operation" which included the following language:

---

1. The material facts set forth here are undisputed. Where the parties dispute facts, they are either immaterial or construed in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

2. Raytheon issued both paper maintenance manuals and maintenance manuals in electronic format, and Colgan used both types of manuals in connection with maintaining their fleet of approximately seventeen 1900 Series aircraft. The substantive content of the electronic and paper manuals was identical. With respect to the maintenance performed on the trim tab cables at issue here, Colgan contends that the REPS Manual was used exclusively and the analysis proceeds on that assumption.

Proper winding of the cables on the pedestal and actuator drums, is shown in ... the *Elevator Tab Control Cable Winding illustration in Chapter 27–30–04* for elevator tabs, ensures against crossing the cables and causing improper trim tab movement. (underline in original)

Clicking on the underlined portion of the language above led to Figure 201 of Chapter 27–30–04, which depicted the forward trim cable drum backwards, or 180 degrees from the installed position, and shows the open, keyed side of the drum, instead of the flat side. Colgan claims that its maintenance crew followed the REPS Manual's directions as depicted in Figure 201 resulting in the reversal of the action of the elevator manual trim system.

Colgan also asserts that the table of contents for Chapter 27 failed to contain a reference or hyperlink to an operational check that would have revealed the problem with the trim tabs.[3] Because Colgan's maintenance personnel did not locate or find the appropriate operational check, which was included in both the paper and REPS versions of the manual, they proceeded to devise their own check. Their check was not sufficient to disclose the problem with Aircraft N240CJ's elevator trim system. Colgan contends that these two alleged defects with the REPS Manu-

al—the reverse drawing and the missing hyperlink—proximately caused the crash.[4] It is worth noting that these alleged defects appeared in all relevant versions of the manual, both electronic and paper.

Raytheon disputes that these alleged defects in the manual caused the crash, and argues that the blame for the reversed trim tab controls rests squarely on the shoulders of Colgan's maintenance and flight crews. The error in Figure 201, Raytheon claims, should have been immediately apparent to Colgan's maintenance crew as the drum depicted in Figure 201 is patently backwards from the actual drum, which shows the flat side, and cannot be reversed in the aircraft itself. In addition, Raytheon contends that Colgan's maintenance crew committed independent error in crossing the cables through the back of the aircraft, without which the error in the manual would have been obvious. Further, Raytheon argues that the failure of Colgan's mechanics to perform an adequate operational check cannot reasonably be ascribed to the missing hyperlink, since Colgan's mechanics knew that they needed to perform the operational check, and indeed had done so in the past. Raytheon also argues that the missing hyperlink is irrelevant because the section of the manual describing the correct operational check could have been located without the hyper-

---

3. A hyperlink is a reference in a hypertext file such as the REPS Manual to another location in the file. Hyperlinks are typically activated by clicking on the highlighted text, which will cause the display of the target link. Revision 10 of the REPS Manual, which Colgan had not yet received, did contain a hyperlink to the operational check.

4. Subsequent to the crash, the Federal Aviation Administration ("FAA") issued Airworthiness Directive 2003–20–10, which made the following comment on the maintenance manuals used to service Beechcraft 1900 series aircraft:

The figures in the applicable maintenance manuals depict the elevator trim cable drum at 180 degrees from the installed position and show the open, keyed side of the drum instead of the flat side of the drum. Following these figures when installing the control cables on the forward control cable drum could reverse the action of the elevator manual trim system; and

The existing procedure can be enhanced by visually confirming the trim wheel position and the trim tab position are consistent. Such a check would detect and correct any problems with the elevator trim system installation before problems occur during operation.

link. Moreover, Raytheon argues that the pilots were also negligent in not discovering the defective trim tabs in their pre-flight check.

In resolving Raytheon's motion for summary judgment, it is unnecessary to reach and decide the parties' dispute about the cause of the accident. This is so because Raytheon's summary judgment motion contends that the terms of the warranty and waiver of rights provided pursuant to the lease of Aircraft N240CJ releases any claims Colgan may have against Raytheon for loss of the aircraft. Accordingly, the analysis herein proceeds on the premise that the alleged defects in the maintenance manual existed and caused the crash. The facts material to the disposition of Raytheon's summary judgment motion are set forth in greater detail in the following enumerated paragraphs.

**The Definitive Agreement**

1. Aircraft N240CJ was leased to Colgan pursuant to a definitive agreement ("Definitive Agreement") signed by Colgan, RACC, and RAAS on August 1, 2002.

2. Article 3 of the Definitive Agreement provided for the lease of certain identified used Beechcraft 1900D Airliner aircraft, and requires that certain support items were "to be provided to Colgan as part of this transaction." Accordingly, RAAS was required to deliver one copy of the following support items: a Pilot's Operating Handbook, an FAA Approved Aircraft Flight Manual, a Parts Catalog, an Electrical Wiring Diagram Manual, a Radio and Electronic Wiring Diagram, a Structural Repair Manual, a Structural Inspection Manual, a Component Maintenance Manual, and most importantly for present purposes, a Maintenance Manual. As discussed more fully below, Colgan disputes ever having received a maintenance manual in relation to the Definitive Agreement.

3. Article 10.16 of the Definitive Agreement contained a clause entitled "Entire Agreement" which provided:

   This Agreement contains the entire agreement of the parties and supercedes any and all prior agreements between the parties, written or oral, with respect to the transactions hereby contemplated, and specifically supercedes the comprehensive lease proposal given by RACC and RAAS to Colgan, dated March 15, 2002. There are no verbal understandings, agreements, representations or warranties between the parties which are not expressly herein set forth. This Agreement may not be changed or terminated orally but may only be changed by an agreement in writing signed by the party or parties against whom enforcement of any waiver, change, modification, extension, discharge or termination is sought.

4. In addition to the lease of certain identified aircraft, Article 4.1 of the Definitive Agreement grants to Colgan the option to lease up to fifteen additional used Beechcraft 1900D aircraft. These aircraft would not be specifically identified until Colgan exercised this option.

5. Thereafter, Colgan did exercise this option and the aircraft here in issue—Aircraft N240CJ—was the 8th or 9th option aircraft.

**The Lease Agreement, Side Letter Agreement and Used Airliner Warranty for Aircraft N240CJ**

6. With certain exceptions not at issue in this case, these aircraft were to be leased pursuant to the terms and conditions of a form lease attached to the Definitive Agreement, and a lease

agreement ("Lease Agreement") identical to this form was in fact signed by Colgan and RACC on January 3, 2003 for Aircraft N240CJ.

7. The Lease Agreement provided that Colgan would lease Beechcraft 1900D Airliner aircraft from RACC in accordance with the terms and conditions set forth in the Definitive Agreement.

8. Article 5 of the Lease Agreement was titled "Warranties and Lessor's Disclaimer." It provided the following relevant disclaimer:

> 5.2 LESSEE ACKNOWLEDGES AND UNDERSTANDS THAT ANY MANUFACTURER'S WARRANTY COVERAGE OFFERED OR AVAILABLE ON THE AIRCRAFT SHALL BE THE SUBJECT OF A SEPARATE CONTRACTUAL AGREEMENT BETWEEN LESSEE AND THE AIRCRAFT MANUFACTURER.

9. In addition to this reference to the manufacturer's contract, Article 5 of the Lease Agreement made clear that

Colgan and not RACC was to bear the risk for any loss of aircraft N240CJ.[5]

10. Importantly, Article 10 of the Lease Agreement specifically addressed "Loss or Damage" to Aircraft N240CJ, and states in 10.1 in pertinent part that Colgan "assumes and shall bear the entire risk of loss, destruction, theft, taking of or damage to the Aircraft *from any cause whatsoever.*" (emphasis added)

11. The separate manufacturer's warranty referenced in Article 5.2 of the foregoing was provided to Colgan pursuant to a Side Letter Agreement between RAAS and Colgan which was signed on January 9, 2003. This side letter agreement confirmed that:

> In lieu of the standard 30–day Used Airliner Warranty, Lessee will be provided with an extended warranty, which shall start on the Lease Commencement Date and will end the earlier of: (a) ninety (90) days from the Lease Commencement Date, or (b) the date the A and B structural inspection ("Inspection") is commenced

5. The remainder of Article 5 provided as follows:

> 5.3 LESSEE ACKNOWLEDGES AND UNDERSTANDS LESSOR IS NOT THE MANUFACTURER OF THE AIRCRAFT TO BE LEASED HEREUNDER. THEREFORE, LESSOR LEASES THE AIRCRAFT TO LESSEE IN AN "AS IS" AND "WITH ALL FAULTS" CONDITION. LESSOR MAKES NO WARRANTIES OR REPRESENTATIONS TO LESSEE, EITHER EXPRESS OR IMPLIED, AS TO:
> (A) THE CONDITION, DESIGN, OPERATION, FITNESS FOR USE OR MERCHANTABILITY OF THE AIRCRAFT;
> (B) THE FITNESS OF THE AIRCRAFT FOR ANY PARTICULAR PURPOSE OF LESSEE;
> (C) THE AIRWORTHINESS OF THE AIRCRAFT; OR
> (D) ANY OTHER MATTER WHATSOEVER, IT BEING EXPRESSLY AGREED BY THE PARTIES THAT ALL RISKS RE-

> LATING TO OR ARISING FROM LESSEE'S USE AND OPERATION OF THE AIRCRAFT SHALL BE BORNE AND ASSUMED SOLELY BY LESSEE.
> 5.4 WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LESSOR SHALL NOT BE LIABLE FOR ANY DEFECTS, EITHER LATENT OR PATENT, IN THE AIRCRAFT NOR FOR ANY GENERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OF THE AIRCRAFT, LOSS OF PROFITS OR FOR ANY INTERRUPTION IN LESSEE'S BUSINESS OCCASIONED BY ITS INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER. LESSOR SHALL NOT BE LIABLE FOR ANY DAMAGES CLAIMED BY LESSEE OR ANY OTHER PERSON OR ENTITY UPON THE THEORIES OF NEGLIGENCE OR STRICT LIABILITY IN TORT.

on the Aircraft. The Inspection will be paid for by Lessee and is not covered under the Used Airliner Warranty.

12. The Side Letter Agreement further provided that with the exception of the above language the standard Used Airliner Warranty would apply to the transaction.

13. Though the Side Letter Agreement was signed by RAAS, consistent with Article 5.2 of the Lease Agreement, the standard Used Airliner Warranty was provided by Raytheon. The Used Airliner Warranty expressly stipulates that the "law of Kansas applies to this warranty," and provides the following limited warranty: Subject to the limitations and conditions hereinafter set forth, Raytheon warrants, at the time of the delivery by Raytheon, each part of the Aircraft, except avionics equipment and engines . . ., to be free from (i) defects in materials or workmanship, and (ii) defects in design that in view of the state-of-the-art as of the date of manufacture should have been foreseen; provided, however, that the defect must be discovered and reported to Raytheon within thirty (30) days from the date of delivery of the Aircraft to Buyer.

Obviously, the 30 day warranty would have been extended to 90 days pursuant to the Side Letter Agreement, but otherwise the language is operable.

14. Further, section B of this warranty makes the following limitations on Raytheon's liability:

3. TO THE EXTENT ALLOWED BY APPLICABLE LAW, BUYER WAIVES AS TO RAYTHEON AND SELLER ALL OTHER WARRANTIES, WHETHER OF MERCHANTABILITY, FITNESS OR OTHERWISE. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF.

4. TO THE EXTENT ALLOWED BY APPLICABLE LAW, THE OBLIGATIONS OF RAYTHEON SET FORTH HEREIN SHALL BE THE EXCLUSIVE REMEDIES FOR ANY BREACH OF WARRANTY HEREUNDER, AND, TO THE SAME EXTENT, NEITHER RAYTHEON NOR SELLER SHALL BE LIABLE FOR ANY GENERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OR LOSS OF PROFITS, OR ANY DAMAGES TO THE AIRCRAFT CLAIMED BY BUYER OR ANY OTHER PERSON OR ENTITY UPON THE THEORIES OF NEGLIGENCE OR STRICT LIABILITY IN TORT.

This warranty language was capitalized in the original to comply with any conspicuousness requirement.

15. The Operating Lease Proposal, which had served as the draft Definitive Agreement, had contained an exhibit entitled 1900D Airliner Specifications. This exhibit listed in great detail the component parts of the 1900D Airliner series, and included under the "Service" subheading, the following items: all available records and logbooks; service information materials; avionics wiring diagrams; passenger briefing cards; pilots check list; and pilots operating handbook and FAA approved airplane flight manual.

16. Article 7 of the Lease Agreement concerned "Maintenance and Records," and provided generally that

Colgan was under an obligation to maintain Aircraft N240CJ and comply with the regulations of the Federal Aviation Administration ("FAA"). Article 7.3 specifically addressed Colgan's obligation regarding maintenance manuals by providing that:

Lessee will maintain the Aircraft in accordance with the Manufacturer's operating, inspection and maintenance manuals or Lessee's FAA-approved maintenance and inspection program, and in compliance with all applicable FAR requirements set forth under Title 14 of the Code of Federal Regulations . . . .

17. Article 9 concerned "Insurance" and required Colgan to obtain and carry certain specified types of insurance coverage, including "all risk" hull insurance, insurance on Aircraft N240CJ's engines, passenger liability, public liability and property damage liability. Any insurance proceeds were to be payable jointly to Colgan and RACC, however, Articles 10.2 and 10.3 set forth the procedure for payment of insurance proceeds to RACC should there have been a "total loss" of the airplane.

## Evidence Concerning the Purchase of Maintenance Manuals by Colgan

18. The parties dispute whether maintenance manuals, in either paper or electronic format, were ever received in conjunction with the lease of the aircraft, and whether Raytheon provided any manuals free of charge pursuant to the Definitive Agreement and the Lease Agreement. Colgan contends that between early 2001 and the date of the accident, Raytheon did not provide a single free maintenance manual in either paper or REPS form, and that all manuals had been ordered and paid for independent of the Definitive Agreement and Lease Agreement. Colgan supports this contention with affidavits and documents.[6] Raytheon, too, submits affidavits and documents in support of its contrary contention that the maintenance manuals were provided free of charge in connection with the Lease Agreement.[7]

## Colgan's Complaint

19. Colgan claims that defects in the REPS Manual were responsible for the crash of Aircraft N240CJ. Though this assertion is heavily disputed, it is assumed to be true for purposes of Raytheon's summary judgment motion. Colgan's complaint contains counts for negligence, strict liability, and breach of warranty. They seek the following damages: (i) damages for the destruction of the aircraft; (ii) damages for expenses incurred due to the unavailability of the aircraft; (iii) lost profits due to the unavailability of the aircraft; (iv) losses due to accident cleanup expenses; (v) expenses incurred in the accident investigation; (vi) losses not covered under the insurance contract with AIGG Aviation; and (vii) legal fees and expenses.

6. Specifically, Colgan has provided three affidavits, as well as copies of purchase orders, invoices, and check stubs said to reflect payment for a subscription of REPS Manuals in 2001 and then payment again for subscription renewals in May 2003.

7. Raytheon supports its contentions with affidavits from its employees stating that while Colgan did pay for some manuals, these were manuals ordered prior to the Definitive Agreement and that any subscriptions paid for after the signing of the Definitive Agreement were for the renewal of these manuals.

## II.

As this is a diversity suit, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), requires that forum state law, including forum state choice of law rules, governs the substantive claims. And, as the aircraft crashed in Massachusetts, it follows that under Virginia choice of law rules, Massachusetts law governs the claims for negligence, strict liability, and breach of express and implied warranty. But this conclusion does not hold for any question concerning the validity and effect of the Used Airliner Warranty and the waiver of rights it contains. On these questions, Kansas law governs, as the warranty explicitly provides that the "law of Kansas applies to this warranty." And, Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances, none of which exist here. *See, e.g., Hitachi Credit America Corp. v. Signet Bank* 166 F.3d 614, 624 (4th Cir.1999). Accordingly, the validity and effect of the United Airliner Warranty will be construed according to Kansas law.

■ Under both Kansas and Massachusetts law, an insurer's right of subrogation is derived from the insurance contract. *Farmers Ins. Co. v. Farm Bureau Mut. Ins. Co.,* 227 Kan. 533, 539, 608 P.2d 923, 928 (1980); *Travelers Ins. Co. v. Cremin,* 2002 WL 206357 (Mass.App.Div.2002). An insurer claiming the right of subrogation-here, AIG-stands in the shoes of its insured-here, Colgan-and any defenses against the insured are likewise good against the insurer. *Western Motor Co., Inc. v. Koehn,* 242 Kan. 402, 405, 748 P.2d 851, 853 (1988); *Home Owners' Loan*

*Corp. v. Baker,* 299 Mass. 158, 162, 12 N.E.2d 199 (1937).

## III.

■ The essential question presented by Raytheon's summary judgment motion is whether the Used Airliner Warranty, with its attendant waiver of rights, bars Colgan's claims in this case. And, the starting point in this analysis is the language of the warranty itself. By its clear terms, the warranty limits all warranty coverage to the ninety (90) day period set forth in the Side Letter Agreement [8] and further states that Colgan "WAIVES AS TO RAYTHEON AND SELLER ALL OTHER WARRANTIES, WHETHER OF MERCHANTABILITY, FITNESS OR OTHERWISE" and that "THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF." [9]

Thus, the terms of the Used Airliner Warranty make clear that Colgan may assert no warranty against Raytheon other than the explicit warranty provided for the 90 day period. To underscore this point, Section 4 of the Used Airliner Warranty explicitly provided that Colgan waived all rights to seek general, consequential, or incidental damages relating to the loss of the leased Aircraft based on any negligence or strict liability theory. This provision is central to the analysis and deserves to be set out in full, as follows:

> TO THE EXTENT ALLOWED BY APPLICABLE LAW, THE OBLIGATIONS OF RAYTHEON SET FORTH HEREIN SHALL BE THE EXCLUSIVE REMEDIES FOR ANY BREACH OF WARRANTY HEREUN-

8. *See supra,* Part I, paras. 11–13.

9. This language appears here, as it did in the Used Airliner Warranty, in all capital letters to ensure its conspicuousness. *See, e.g., Geo.*

*C. Christopher & Son, Inc. v. Kansas Paint & Color Co., Inc.,* 215 Kan. 185, 191, 523 P.2d 709, 715 (1974) (warranty disclaimers must be both in writing and conspicuous).

DER, AND, TO THE SAME EXTENT, NEITHER RAYTHEON NOR SELLER SHALL BE LIABLE FOR ANY GENERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, INCLUDING, WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OR LOSS OF PROFITS, OR ANY DAMAGES TO THE AIRCRAFT CLAIMED BY BUYER OR ANY OTHER PERSON OR ENTITY UPON THE THEORIES OF NEGLIGENCE OR STRICT LIABILITY IN TORT.[10]

Thus, the Used Airliner Warranty makes unmistakably clear (i) that Colgan has no warranty rights against Raytheon except the 90 day express warranty (which had expired by the time of the crash); and (ii) that Colgan waived all claims based on negligence or strict liability in tort it might have had against Raytheon. In so doing, the Used Airliner Warranty is fully consistent with other aspects of the Lease Agreement that embody the parties' intent, as reflected in Article 10.1 of the Lease Agreement, that Colgan alone bore the risk of loss of the aircraft "from any cause whatsoever."[11] The parties' intent in this regard is further confirmed by the Article 10.2 and 10.3 requirement for Colgan to purchase an insurance policy payable to RACC in the event of "total loss" of the aircraft. In sum, the plain terms of the Used Airliner Warranty bar Colgan's claims here, and in so doing give full effect to the parties' risk allocation bargain.[12]

This does not end the analysis, however, because Colgan contends that its claims are not based on the defect in Aircraft N240CJ, but rather on defects in the aircraft's maintenance manuals. Specifically, Colgan contends that the aircraft's maintenance manual is a separate and distinct product from the aircraft because it was purchased and paid for separately. Given this, Colgan argues that the Warranty waiver is ineffective to bar claims based on alleged defects in the maintenance manual. Raytheon responds with the argument that the manual and the aircraft are an integral, single product, as (i) the aircraft cannot be used as an airliner without the manual; and (ii) the manual has no use other than making possible the use of the aircraft. In other words, Raytheon argues the aircraft cannot be flown or used as an airliner unless it is maintained pursuant to Raytheon's maintenance manual.

The validity and effect of Colgan's waiver of tort and warranty rights in the Used Airliner Warranty must be governed by Kansas law as it pertains to the scope and

---

**10.** *See supra* Part I, para. 14.

**11.** The Used Airliner Warranty's waiver of claims based on negligence or strict liability rights applies "to the extent allowed by applicable law," as the Warranty itself notes. The parties have cited no Kansas law nor advanced any argument that Kansas law would not allow these provisions of the Used Airliner Warranty to be given full effect.

**12.** A different conclusion might obtain, however, had the alleged defects in the maintenance manual occurred for the first time in a revision issued by Raytheon subsequent to the lease of the aircraft in question and the issuance of the Used Airliner Warranty. This is so because under Kansas law, Colgan could not waive its right to sue over defects of which, by definition, it could not have been aware at the time of the waiver. *See City of Topeka v. Watertower Place Development Group*, 265 Kan. 148, 158, 959 P.2d 894, 901 (1998) ("Waiver implies that a party *voluntarily and intentionally gives up a known right* or takes some action inconsistent with the contractual right.") (emphasis added); *D.M. Ward Const. Co., Inc. v. Electric Corp. of Kansas City*, 15 Kan.App.2d 114, 117, 803 P.2d 593, 596 (1990) (same). As already noted, however, because these defects long preceded the Lease Agreement and Used Airliner Warranty, Kansas law presents no obstacle to the enforcement of the parties bargained-for risk allocation.

nature of that warranty. As it happens, no Kansas court has yet has addressed this issue.[13] Although Kansas courts have been silent on this issue, other courts have addressed this essential issue, virtually all of which have reached the conclusion that a product, such as an aircraft, and its maintenance or other operational manuals are a single, integrated product.[14] The rationale for this result is obvious: Flight and maintenance manuals for aircraft are indispensable to maintain the aircraft's airworthiness certificate without which the aircraft cannot be flown or used. Indeed, these manuals have no other use than to allow the aircraft to qualify for an airworthiness certificate and to be flown. Moreover, these manuals are highly specific to particular aircraft models. The Ninth Circuit in *Caldwell v. Enstrom Helicopter Corp.* expressed this single-product rationale in the following terms:

[A] flight manual is an integral part of the general aviation aircraft product that a manufacturer sells. It is not a

separate, general instructional book (like a book on how to ski), but instead is detailed and particular to the aircraft to which it pertains. The manual is the 'part' of the aircraft that contains the instructions that are necessary to operate the aircraft and are not separate from it. 230 F.3d 1155, 1157 (9th Cir. 2000).

Similarly, the Tenth Circuit reached the same result in a case involving a flight manual, holding that the flight manual and an aircraft were a single product for liability purposes under Indiana law. *See Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1220 (10th Cir.1991) There, the Tenth Circuit found persuasive on this point a Sixth Circuit decision applying Tennessee law and holding that an instruction manual for a hoist was inseparable from the hoist itself for product liability purposes. Quoting the Sixth Circuit, the Tenth Circuit held that *"the instructions themselves are not a 'product' [separate from the aircraft] as defined by the act."*

---

**13.** This is also an issue of first impression under Massachusetts law.

**14.** *See, e.g., Schamel v. Textron–Lycoming, a Div. of Avco Corp.*, 1 F.3d 655, 657 (7th Cir. 1993) ("The provision of service manuals and other sources of service information is not a separate and discrete, post-sale undertaking ...; rather, such information is generally necessary to satisfy the manufacturer's duty to warn."); *Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1219–20 (10th Cir.1991) (The Indiana Products Liability Act "does not apply to a transaction that, by its nature, involves wholly or predominantly the sale of a service rather than a product. We feel ... that the instructions [in the flight manual] are not a product as defined by the act."); *Alter v. Bell Helicopter Textron, Inc.*, 944 F.Supp. 531, 540 (S.D.Tex.1996) (helicopter manual same product as helicopter under Texas products liability law). Courts addressing this issue outside the aviation context have reached the same conclusion. *See Jordan v. Sandwell*, 189 F.Supp.2d 406, 416–17 (W.D.Va.2002) (dealing with instruction manual for contaminated

water cleaning system, the court stated that "[t]he great majority of the cases find that a manual is an inseparable part of the system or product that the plaintiff complains was defective."); *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1134–35 (6th Cir.1986) (manual for hoist not separate product from hoist itself); *Sea–Land Service, Inc. v. General Electric Co.*, 134 F.3d 149 (3d Cir.1998) (replacement engine rod not separate product from engine even though rod was purchased after engine).

The sole case holding that an airplane manual is a separate product from its corresponding aircraft is *Driver v. Burlington Aviation, Inc.*, 110 N.C.App. 519, 430 S.E.2d 476 (2002). That case is neither controlling nor persuasive. It is not controlling because it interpreted North Carolina law, not Kansas law. It is not persuasive because the *Driver* court did not even acknowledge, let alone distinguish either the pertinent FAA regulation or any of the myriad of cases reaching the contrary result that an aircraft's manuals are inseparable from the aircraft itself for liability purposes.

(emphasis in original). *Id.* (quoting *Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1135 (6th Cir.1986)).

Further support for the conclusion that Raytheon's 1900C–D maintenance manuals are part of the aircraft is found in the pertinent Federal Aviation Regulations. These regulations, promulgated by the Federal Aviation Administration ("FAA"), require operators to obtain airworthiness certificates for aircraft before they can be flown. The aircraft airworthiness standards, which are codified at 14 C.F.R. § 23, *et seq.*, apply to a broad range of aircraft and require any person or entity seeking to operate an aircraft, *inter alia,* to obtain an airworthiness certificate. *See* 14 C.F.R. § 23.1 (requiring operator of "normal, utility, acrobatic, and commuter" aircraft to obtain airworthiness certificates). This certificate certifies that the aircraft in issue has met certain threshold requirements to be able to be flown safely. The regulations further provide that, as a condition of maintaining an airworthiness certificate, an aircraft operator must take steps to ensure the continued airworthiness of the aircraft for which the certificate was issued. *See* 14 C.F.R. § 23.1529, Appx. G. This means that airworthiness is contingent on the operator's demonstration that the aircraft has been maintained in accordance with the latest revision and changes to the manufacturer's maintenance manual. In other words, an aircraft's maintenance manual is essential to maintaining an aircraft's airworthiness: No aircraft can lawfully be flown and used as an airliner unless it is maintained, as required by FAA regulations, in accordance with the manufacturer's maintenance manual.

Given this, an aircraft's maintenance manual is analogous to an "on-off" switch that must be turned on before the aircraft can be flown. To be sure, the aircraft's maintenance manual need not be carried on board during flight, nor is it physically attached to the aircraft as is the electrical power "on-off" switch. Nonetheless, before the electrical power switch may be turned on, the "on-off" switch represented by the maintenance manual must be activated first by the aircraft's operator demonstrating that the aircraft has been maintained in accordance with the maintenance manual and is worthy of an airworthiness certificate. In sum, then, it is reasonable, as courts have found, to view an aircraft's maintenance manual as part of the aircraft and together as a single integral product.

Yet, even this does not end analysis of the question presented, because Colgan contends that the maintenance manuals used in connection with Aircraft N240CJ cannot be part of the aircraft since Colgan paid for or received these maintenance manuals in transactions separate from the Lease Agreement. The parties sharply dispute whether Colgan ever purchased manuals separately from the Lease Agreement. In essence, Colgan contends that between early 2001 and the date of the accident, Raytheon did not provide any free maintenance manuals in either paper or REPS form, and that all manuals were ordered and paid for in separate transactions.[15]

Raytheon, by contrast, claims, with affidavit support, that it provided maintenance manuals at no extra charge for each of the 1900 series aircraft leased by Colgan pursuant to the Definitive Agreement, including Aircraft N240CJ. Raytheon further contends that the subscription renewal Colgan paid for in 2003 concerned a subscription for a variety of manuals for both 1900C and 1900D aircraft, and that this subscription predated the Definitive Agreement.

---

**15.** *See supra,* para. 18.

Yet, in the end, it is immaterial whether Colgan received the maintenance manuals pursuant to a subscription it paid for in 2001 and renewed in 2003, or whether the particular manuals in issue were provided by Raytheon free of charge. This is so because the rationale for holding that the aircraft's maintenance manual is a part of the aircraft does not depend upon whether the manual is provided free with the aircraft; hence, the single product conclusion holds true whether the manual is purchased or provided free with the aircraft. Nor does it matter that the manuals in question may have been received by Colgan pursuant to a subscription purchased by Colgan from Raytheon in 2001, long before the Definitive Agreement and the lease of Aircraft N240CJ in January 2003. This, too, does not affect the validity of the single product rationale underlying the conclusion that the aircraft's maintenance manual and the aircraft are a single, integral product, or, put another way, that the aircraft's maintenance manual is simply another part of the aircraft. The Third Circuit's decision in *Sea–Land Service, Inc. v. General Electric Co.*, 134 F.3d 149, 154 (3d Cir.1998), while not factually identical, is nonetheless instructive on this point. There, a defective engine rod was held to be the same product as the engine for economic loss doctrine purposes. In other words, the rod and the engine were the same product notwithstanding that the rod was purchased separately.

It also bears repeating at this point that Colgan was operating a fleet of at least 17 Beech 1900 C and D aircraft and that it doubtless had a number of maintenance manuals in paper and electronic format which it used to maintain this fleet.[16] And, the parties agree that the defects Colgan alleges existed in Revision 9 of the manuals—the revision in issue—were also pres-ent in previous versions of the manuals issued prior to the Definitive Agreement and the Lease Agreement for Aircraft N240CJ. Thus, the allegedly erroneous illustration of the front trim tab cable drum did not change from the 2001 manuals to the Revision 9 REPS Manual used by Colgan's maintenance personnel immediately prior to the August 2003 crash. Similarly, the alleged missing hyperlink defect is also not new; no version of the REPS Manual contained a hyperlink to the relevant operational check from the time the check first appeared in Revision 6. Nor is there any evidence that the particular Revision 9 REPS Manual used by the Colgan mechanics differed from any other Revision 9 REPS Manual. In other words, there is no allegation that a "one-off" typographical error or a software glitch peculiar to the specific manual used by Colgan maintenance personnel in August 2003 is to blame for the defect; rather, the parties agree that the maintenance manual errors Colgan alleges led to the crash, were the same in every Revision 9 REPS manual issued by Raytheon.

Because (i) the defects remained constant throughout the various versions of the maintenance manual; and (ii) both defects on which Colgan seeks recovery predated the Lease Agreement, in which Colgan relinquished its right to sue on any ground after the 90 day warranty period, it follows that Colgan waived its right to recover on these defects when it entered the Lease Agreement and received the attendant Used Airliner Warranty in January 2003. To reach a different result on the basis that the manuals were received pursuant to a separately-paid subscription would ignore the essential nature of the manuals as a part of the aircraft akin, as noted, to an "on-off" switch; the aircraft

---

**16.** The parties agree that Colgan was free to make as many copies of the paper manual or to burn as many copies of the REPS manual as it wished.

engines cannot be started, the aircraft cannot be taxied and flown unless Colgan obtains an airworthiness certificate, which it cannot do without first maintaining the aircraft pursuant to Raytheon's maintenance manuals. Moreover, a different result would also free Colgan to undo the parties' negotiated allocation of risks associated with the lease by simply renewing a previous subscription. Colgan's 2001 payment for a subscription for the maintenance manuals and its 2003 payment renewing this subscription does not alter either the nature of the manual as a part of the aircraft, or the nature of the parties' risk allocation bargain in which Colgan assumed "the entire risk of loss ... to the Aircraft from any cause whatsoever." Accordingly, the Used Airliner Warranty with its attendant waiver of rights against Raytheon bars Colgan's claims in · this case.[17]

## IV.

■ In the alternative, should the warranty not bar Colgan's claims, it also appears from the record and the governing law that Colgan's express warranty and strict liability claims are nonetheless barred. Under Massachusetts express warranties are governed by M.G.L.A. 106, § 2–313(1), which provides that express warranties are created by:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise; or

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

Colgan contends that the following statements by Raytheon in the aircraft's maintenance manual created an express warranty:

Title Page, 00–00–00: This manual includes the maintenance information required to be available by 14 C.F.R. Part 23.

Chapter 27–00–00–001, FLIGHT CONTROLS DESCRIPTION AND OPERATION: Proper winding of the cable on the pedestal and actuator drum, is shown in the Aileron Tab Control Cable winding illustration in Chapter 27–10–05 for aileron tabs, the Rudder Tab Control cable winding illustration in Chapter 27–20–05 from rudder table and the *Elevator Tab Control cable winding illustration in Chapter 27–30–04* for elevator tabs, ensures against crossing the cables and causing improper trim tab movement.

Representations such as these made in a manual provide instruction; they do not rise to the level of affirmation of fact or promise. *Jones v. Walter Kidde Portable Equipment, Inc.,* 183 F.3d 67, 70 (1st Cir. 1999) (holding that statement in instructional manual does not constitute express warranty). Were a *contrary result to ob*tain, express warranties would·be superfluous, as every statement in an operational manual would constitute a promise regarding *the product's performance.*

■ Colgan's claims on the basis of strict liability also fail as a matter of law because Massachusetts does not recognize a cause of action for strict liability in tort. *See Sebago, Inc. v. Beazer East, Inc.,* 18 F.Supp.2d 70, 89 (D.Mass.1998). For these reasons, Colgan's claims based on breach of express warranty and strict liability in tort are barred under Massachu-

---

**17.** This result was reached as a matter of Kansas law, but it is important to note that the same result would be reached for the same reasons were Massachusetts law to govern this issue.

setts law independent of the Used Airliner Waiver's prohibition.

An appropriate order will issue.